# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

M.P., by and through JENNIFER PINCKNEY, as PARENT, NATURAL GUARDIAN, and NEXT FRIEND of her minor daughter, M.P.

      *Plaintiff-Appellant*

v.

META PLATFORMS INC., f/k/a FACEBOOK, INC., f/k/a FACEBOOK PAYMENTS INC., f/k/a FACEBOOK TECHNOLOGIES LLC, f/k/a INSTAGRAM, LLC, f/k/a SICULUS INC., f/k/a FACEBOOK HOLDINGS LLC; INTERNET RESEARCH AGENCY LLC a/k/a MEDIASINTEZ LLC, a/k/a GLAVSET LLC, a/k/a MIXINFO LLC, a/k/a AZIMUT LLC, a/k/a NOVINFO LLC; CONCORD MANAGEMENT AND CONSULTING LLC; CONCORD CATERING; YEVGENIY VIKTOROVICH PRIGOZHIN

      *Defendants-Appellees*

On Appeal from the United States District Court for the District of South Carolina, Charleston Division (Case 2:22-cv-03830-RMG)

---

## APPELLANT'S BRIEF

---

François M. Blaudeau (ASB-7722-D32F)
Evan T. Rosemore (ASB-3760-N10B)
SOUTHERN MED LAW
2762 BM Montgomery St, Ste 101
Homewood, AL 35209
D: 205.564.2741
F: 205.649.6386
francois@southernmedlaw.com
evan@southernmedlaw.com

*Attorneys for Appellant*

**Statement Regarding Oral Argument**

Appellant requests oral argument. This appeal raises important questions about the original public meaning of the Section 230 of the Communications Decency Act, 47 U.S.C. § 230.

## Reference Format

*Argument and Citations of Authority*: Citations of authority in this brief are intended to comply with the latest edition of *The Bluebook®: A Uniform System of Citation*.

*References to the Record*: Citations to the record are made in accordance with the *Fourth Circuit Appendix Pagination & Brief Citation Guide*, as prescribed by 4th Cir. R. 28(g).

# Table of Contents

Statement Regarding Oral Argument............................................. ii

Reference Format ...................................................................... iii

Table of Contents ...................................................................... iv

Table of Authorities .................................................................. v

Statement of Jurisdiction ........................................................... 1

Statement of the Issues .............................................................. 2

Statement of the Case................................................................. 3

Summary of the Argument ......................................................... 8

Argument .................................................................................. 12

   I.    Standard of Review............................................................ 12

   II.    Section 230 does not apply to claims based on defective platform design because such claims do not make internet service providers liable for content that is not their own....................... 12

   III.    M.P. has pleaded a plausible claim for relief under 42 U.S.C § 1986....................................................................................... 35

   IV.    Social media platforms are "products." ............................. 42

   V.    M.P. has plausibly alleged causation. ................................. 53

   VI.    M.P. has plausibly alleged a duty owed to her by Meta.... 58

Conclusion.................................................................................. 62

Certificate of Compliance ........................................................... 63

# Table of Authorities

## Cases

*A.M. v. Omegle.com, LLC*, 2022 WL 2713721 (D.Or. 2022) .......... 49

*Almeida v. Amazon.com, Inc.*, 456 F.3d 1316 (11th Cir. 2006) ..... 20

*Alvarez v. Hill*, 518 F.3d 1152 (9th Cir. 2008) ............................ 41

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................... 12

*Bauer v. Armslist, LLC*, 572 F.Supp. 3d 641 (E.D. Wis. 2021) ..... 13

*Bishop v. S.C. Dep't of Mental Health*, 331 S.C. 79, 502 S.E.2d 78 (1998) ........................................................................................ 57

*Carafano v. Metrosplash.com, LLC*, 339 F.3d 1119 (9th Cir. 2003) ...................................................................................... 20

*Chicago Lawyers' Comm. for Civ. Rights Under L., Inc. v. Craigslist, Inc.*, 519 F.3d 666 (7th Cir. 2008). ............................................. 23

*Clark v. Clabaugh*, 20 F.3d 1290 (3rd Cir. 1994) .......................... 38

*Comm. of Pub. Works of City of Charleston v. Costco Wholesale Corp.*, 2021 Wl 5908758 (D.S.C. 2021) ....................................... 60

*DeLoach v. Whitney*, 273 S.E.2d 768 (S.C. 1981) .......................... 46

*Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016) ........... 34

*Doe v. Mindgeek USA Inc.*, 574 F. Supp. 3d 760 (C.D. Cal. 2021) 32

*Doe v. Snap, Inc.*, 2022 WL 2528615 (S.D. Tex. 2022) ................. 32

*Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889 (N.D. Cal. 2021) ........... 47

*Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137 (9th Cir. 2022) ................. 47

*Dorrell v. S.C. Dep't of Transp.*, 361 S.C. 312, 605 S.E.2d 12 (2004) ........................................................................................ 58

*Dyroff v. Ultimate Software Group, Inc.*, 934 F.3d 1093 (9th Cir. 2019) ......................................................................18, 19, 25, 31

*Erie Ins. Co. v. Amazon.com, Inc.*, 925 F.3d 135 (4th Cir. 2019) . 13, 28, 30

*Estate of B.H. v. Netflix, Inc.*, 2022 WL 551701 (N.D. Cal. 2022). 48

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) ..................................... 15, 19

*Fields v. Twitter*, 217 F. Supp. 3d 1116 (N.D. Cal. 2016), *aff'd*, 881 F.3d 739 (9th Cir. 2018) ........................................................... 32

*Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019)...............passim

*Gonzales v. Google*, 2 F.4th 871 (9th Cir. 2021) ...................... 34, 50

*Hardin v. PDX, Inc.*, 227 Cal.App. 4th 159 (2014)........................ 47

*Henderson v. Source for Pub. Data, LP*, 53 F.4th 110 (4th Cir. 2022) ......................................................................................passim

*In re Breast Implant Prod. Liab. Litig.*, 503 S.E.2d 445 (S.C. 1998) ............................................................................................... 46

*In re Social Media Adolescent Addiction/Personal Injury Products Liab. Litig.*, 2023 WL 7524912 (N.D. Cal. 2023) ............ 18, 47, 48

*Jolly v. Gen. Elec. Co.*, 435 S.C. 607, 869 S.E.2d 819 (Ct. App. 2011) ..................................................................................... 55, 58

*Lansing v. S.W. Airlines Co.*, 980 N.E.2d 630 (Ill. App. 1st Dist. 2012) ............................................................................................ 15

*Lawing v. Univar, USA, Inc.*, 415 S.C. 209, 781 S.E.2d 548 (S.C. 2015) ............................................................................................ 59

*Lee v. Amazon.com, Inc.*, 291 Cal. Rptr. 3d 332 (Cal. App. 1st Dist. 2022) ............................................................................................ 20

*Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021) ...........passim

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S.Ct. 13 (2020) ............................................................................ 34, 50

*Nemet Chevrolet Ltd v. Consumeraffairs.com Inc.*, 591 F.3d 250 (4th Cir. 2009) ............................................................................ 27

*Oliver v. S.C. Dep't of Highways & Pub. Transp.*, 309 S.C. 313, 422 S.E.2d 128 (1992) ............................................................ 56, 57

*Park v. City of Atlanta*, 120 F.3d 1157 (11th Cir. 1997) ........ 37, 40

*Priest v. Brown*, 302 S.C. 405, 396 S.E.2d 638 (Ct. App. 1990) .... 46

*Rife v. Hitachi Const. Machinery Co., Ltd.* 363 S.C. 209, 609 S.E.2d 565 (S.C.App. 2005). .................................................................. 61

S.C. Code Ann. § 15-73-10 (2005). ............................................... 30

*Simmons v. Poe*, 47 F.3d 1370 (4th Cir. 1995). ........................... 35

*Simulados Software, Ltd v. Photon Infotech Priv., Ltd.*, 40 F.Supp. 3d 1191 (N.D.Cal. 2014) ........................................................... 47

*Skyline Restoration, Inc. v. Church Mut. Ins. Co.*, 20 F.4th 825 (4th Cir. 2021) .................................................................................. 12

*South Carolina Ins. Co. v. James C. Greene and Co.,* 290 S.C. 171, 348 S.E.2d 617 (1986).................................................................. 54

*Stone v. Bethea*, 251 S.C. 157, 161 S.E.2d 171 (1968).................. 57

*Twitter v. Taamneh*, 143 S.Ct. 1206 (2023)................................. 39

*Wallace v. Owens-Illinois, Inc.*, 300 S.C. 518, 389 S.E.2d 155 (Ct. App. 1989).................................................................................. 55

*Webber v. Armslist LLC*, 70 F.4th 945 (7th Cir. 2023) ........... 13, 14

*Winter v. G.P. Putnam's Sons*, 938 F.2d 1033 (9th Cir. 1991)...... 48

*Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997).passim

**Statutes**

28 U.S.C. § 1291................................................................ 1

28 U.S.C. § 1332................................................................ 1

42 U.S.C. § 1985........................................................passim

42 U.S.C. § 1986........................................................passim

47 U.S.C. § 230..........................................................passim

S.C. Code Ann. § 15–73–10 (2005) ........................................ 45, 59

S.C. Code Ann. § 15–73–30 (2005) ........................................ 45, 59

**Other Authorities**

Restatement (Second) of Torts § 402A ........................45, 49, 59, 60

**Rules**

Fed. R. App. P. 3 .............................................................. 1

Fed. R. Civ. P. 12 ............................................................ 12

Fed. R. Civ. P. 54 ......................................................... 1, 7

**Treatises**

Bergman, *Assaulting the Citadel of Section 230 Immunity: Products Liability, Social Media, and the Youth Mental Health Crisis*, 26 Lewis & Clark Law Rev. 1159 (2023) ........................................ 45

CITRON & WITTES, *The Internet Will Not Break: Denying Bad Samaritans § 230 Immunity*, 86 Fordham L. Rev. 401 (2017)... 33

## Statement of Jurisdiction

The District Court exercised jurisdiction over this diversity case under 28 U.S.C. § 1332. There is complete diversity of citizenship between Plaintiff-Appellants M.P., and JENNIFER PINCKNEY, both citizens and residents of South Carolina; Defendant-Appellee META PLATFORMS, INC, an organization formed under the laws of Delaware with its principal place of business in California, including its various named subsidiaries, Defendant-Appellee FACEBOOK HOLDING, LLC, an organization formed in Delaware; FACEBOOK PAYMENTS, INC, an organization formed in Delaware; FACEBOOK TECHNOLOGIES, LLC, an organization formed in Delaware; INSTAGRAM, LLC, an organization formed in Delaware; and SICULUS, LLC, an organization formed in Delaware. None of these Defendant-Appellee organizations are citizens of South Carolina.

This is an appeal as of right under Fed. R. App. P. 3 from a final judgment certified by the District Court under Rule 54(b). This appeal is therefore taken from a final decision under 28 U.S.C. § 1291.

## Statement of the Issues

(1) Did the District Court make a reversible error in its dismissal of Plaintiff's claims for relief under state tort law?

(2) Did the District Court make a reversible error in its dismissal of Plaintiff's claims for relief under 42 U.S.C. § 1985?

(3) Did the District Court make a reversible error in its dismissal of Plaintiff's claims for relief under 42 U.S.C. § 1986?

## Statement of the Case

On June 17, 2015, Dylann Roof walked inside Emanuel AME Church in Charleston, South Carolina ("Mother Emanuel"), joining a group bible study that was in session. [JA006]. While leading bible study at Mother Emanuel, Rev. Clementa Pinckney, the Senior Pastor and a South Carolina State Senator, saw Roof enter the Church and invited him to join the bible study. [JA006]. As the study concluded, Roof stood up, pulled a handgun, and carried out the most vicious hate crime in modern American history. [JA006]. Roof shot and killed nine people: Reverend Clementa Pinckney and eight parishioners: the Rev. Sharonda Coleman-Singleton, the Rev. DePayne Middleton-Doctor, the Rev. Daniel Simmons, Cynthia Hurd, Susie Jackson, Myra Thompson, Ethel Lance, and Tywanza Sanders. Each one of them suffered a horrific, violent death. [JA006].

Jennifer Pinckney and her minor daughter hid under the desk in Reverend Pinckney's office as Roof carried out the slaughter. [JA006]. Extensive scientific study of Roof has shown that his formative years and familial environment did not include

instruction as to white supremacist ideology. [JA007]. Rather, research shows that Roof was radicalized online by white supremacist propaganda that was directed to him by Meta, among other online actors. [JA007].

This action seeks to hold accountable Meta, whose proscribed conduct is a proximate cause of Roof's online radicalization and later homicides, which caused M.P. to suffer, among other things, severe emotional distress given her perception of the massacre. [JA006].

Through repetitious exposure to online white supremacist propaganda, Roof learned how to hate and grew obsessed with white-replacement theory. [JA007]. He was aided by Meta who conspired with the Russian Defendants to target individuals like Roof who would be susceptible to online engagement with the kind of white supremacist propaganda and ideology that leads to offline violence, including the white-replacement theory. [JA007].

By design, Roof was shown so much white supremacist propaganda that he believed the heinous act he ultimately committed at Mother Emanual was necessary to spark a race war

and save the white race. [JA007]. Roof's online radicalization led directly to foreseeable offline violence. [JA007].

In addition to Meta, hostile foreign actors were looking for new opportunities to cause civil unrest in the United States via social media and an increasingly influential online environment. [JA007]. Indeed, highly sophisticated foreign actors deliberately caused civil unrest in the United States by exploiting defective algorithms in social media platforms, that, combined with negligent social media product design, created an efficient form of influence over social media users that inherently drives an ever more extreme and emotional response in the individual, often leading to extreme (and sometimes violent) offline action. [JA007-008]. The Russian Defendants maliciously intended to carry out this clandestine operation to incite racial hate and violence in the United States. [JA008]. They were aided by Meta's defective product, the unfettered use of social media, which they used unrestricted by Meta, in a new way of communicating and influencing individuals with racial narratives and misinformation. [JA008]. The repercussions of this attack on the social fabric of the United States

were dramatic and have caused unimaginable pain and suffering. [JA008].

Pinckney brought this action on November 11, 2022, in the United States District Court for the District of South Carolina at Charleston. [JA002; JA006]. On February 21, 2023, Meta brought a motion to dismiss the complaint for failure to state a claim. [JA003]. Pinckney then responded in opposition to the motion to dismiss. [JA003]. Meta brought a reply in support of its motion to dismiss on April 11, 2023. [JA003]. On July 24, 2023, the district court entered an order and opinion granting Meta's motion to dismiss. [JA003].

On August 21, 2023, Pinckney filed a notice of appeal of the District Court's order granting Meta's motion to dismiss Plaintiff's complaint. [JA083]. After this appeal was docketed on August 24th, Plaintiff brought an unopposed motion to remand the case to the District Court to resolve her pending motion to clarify that only Plaintiff's claims against Meta—and not Defendants Internet Research Agency, LLC; Concord Management and Consulting LLC; Concord Catering; and Yevgeniy Viktorovich Prigozhin (the

"Russian Defendants")—had been dismissed. [JA003]. The motion to remand was granted and the parties ordered to file a status report every thirty days starting on October 10, 2023. [JA003]. On September 14, 2023, the District Court published an amended order and opinion granting Meta's motion to dismiss only as to Meta and its subsidiaries. The District Court expressly clarified that "[t]his Order does not affect the pending claims against the Russian Defendants." [JA003].

Pinckney and Meta jointly filed a Rule 54(b) motion with the District Court. [JA004]. On October 12, 2023, the District Court entered final judgment as to Meta upon the joint Rule 54(b) motion for partial final judgment. [JA004]. The District Court certified that the proceedings below have concluded as to Meta and that there is no just reason for delay. [JA004]. The District Court then entered final judgment as to Meta on October 12, 2023. [JA004].

## Summary of the Argument

M.P. appeals the District Court's order dismissing Meta from this suit on the following grounds:

1.     47 U.S.C. § 230 cannot be applied, pursuant to this Court's decision in *Henderson*, for the simple reason the duty M.P. alleges Meta breached is not based upon the content of any third-party message, but rather on Meta's own independent conduct in designing a product (Facebook), purposefully, to drive extreme emotional reactions in users. It is now well known, through whistleblowers, former insiders and extensive scientific study, that Meta's business model and design of its platform foreseeably cause or substantially contribute to online radicalization, among myriad other social and individual harms. Because M.P.'s Complaint does not seek to hold Meta liable for hosting offending third-party content or for an offending third party's conduct, but rather for designing an unreasonably dangerous product (entirely Meta's own conduct), Section 230 does not apply.

2.     The District Court addressed whether a 42 U.S.C. § 1985 claim was viable against Meta *as a co-conspirator with the*

*Russian Defendants* in their conspiracy to violate civil rights of South Carolinians and others, but the court ignored entirely the ancillary claim under 42 U.S.C. § 1986 that *was* properly pled in the Complaint *and* argued by M.P. to the court. Section 1986 does not require intentional involvement of Meta in the conspiracy (nor racial animus), but only (1) knowledge thereof and (2) negligent failure to "prevent or aid in preventing" the civil rights violations that were the object of the conspiracy. M.P.'s allegations regarding Meta's knowledge of this coordinated activity and failure to take reasonable steps to "prevent or aid in preventing it" from occurring on Meta's platform must be taken as true. These allegations fully support a Section 1986 claim. As such, it was legal error for the court to dismiss this claim (especially without even addressing it).

3.     Facebook is a social media "product" subject to South Carolina product law. Facing a growing number of lawsuits seeking to hold it liable for the defective design of its social media products, Meta has sought to rebrand them as "communication services" and to thereby argue Meta is a "service provider" (rather than a product manufacturer) of an "intangible communication service" that is not

subject to product law. South Carolina product law is not limited to "tangible" products, nor does Meta provide any "services." Meta designed unreasonably dangerous products that can and do cause real physical and emotional harm. Semantics are not a basis for dismissing M.P.'s properly pled product liability claims.

4.     Both causation-in-fact and proximate causation were properly pleaded against Meta, and none of Meta's arguments to the contrary make dismissal *as a pleading matter* proper. Meta argued it was not the "but for" cause of Roof's radicalization because he mentioned other sources of information in his manifesto, but Meta ignored "substantial factor" causation. M.P. is not required to disprove or even discount any of these other sources as concurrent causes of Roof's radicalization. As to proximate causation, the facts pled establish the harm that Roof's radicalization caused was foreseeable to Meta and, again, whistleblowers, former insiders and study of Meta's platform confirm that – Meta knows well that its product design makes Facebook function as a radicalization engine for many individuals. This is why Roof's criminal actions also cannot be deemed a superseding cause of M.P.'s harm *as a matter*

*of law* – the exact type of criminal conduct at issue was entirely foreseeable on account of the way Meta designed its product.

5.     Meta's last argument below was that it had no duty in tort to M.P. because it is not alleged M.P. was a "user or consumer" of Facebook. South Carolina product law does not limit the class of foreseeable victims of a product defect to those who purchase or physically "use" or "consume" the product. Under South Carolina law, since M.P. was a foreseeable victim of the product defect at issue, M.P. is a proper product liability plaintiff to whom Meta absolutely owed the duty to design reasonably safe social media products. As pled, Meta is well aware of how online radicalization on its platform directly leads to real-world harm like genocide, mass shootings, and the like. So not only was this type of harm foreseeable but foreseen *and embraced* by Meta. M.P.'s own Facebook usage (if any) is irrelevant to this suit and any lack thereof is not a basis for dismissal.

# Argument

## I.    Standard of Review

Every issue herein is governed by the same standard of review: "This Court reviews a district court's dismissal under [Rule] 12(b)(6) *de novo*." *Skyline Restoration, Inc. v. Church Mut. Ins. Co.*, 20 F.4th 825, 829 (4th Cir. 2021). In turn, the standard the District Court should have applied is: "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must assume the veracity of well-pled factual allegations, and the complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face. *Id.* at 679.

## II.    Section 230 does not apply to claims based on defective platform design because such claims do not make internet service providers liable for content that is not their own.

There is a world of difference between holding an internet platform liable for hosting a defamatory or offending third-party message (*Zeran*) versus holding an internet platform liable for its own design meant to facilitate radicalization and compulsive use of

the platform by driving extreme emotional reactions. Cf. *Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997). In the former scenario, the plaintiff is attempting to make the provider liable for the content of another's message or for failing to remove, alter, etc. that message. That is clearly an attempt to hold the platform liable for "publishing" offending third-party content. But in the latter scenario, unless the Court engages in significant legal and factual gymnastics, this is decidedly not the case.

That is because the design of the platform has absolutely nothing to do with any third-party content or publication thereof (notwithstanding the irrelevant fact—for our purposes—that the content did play a role in the harm). *See, e.g., Henderson v. Source for Pub. Data, LP*, 53 F.4th 110, 122-23 (4th Cir. 2022) (citing *Erie Ins. Co. v. Amazon.com, Inc.*, 925 F.3d 135, 139-40 (4th Cir. 2019)); *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092-93 (9th Cir. 2021); *Bauer v. Armslist, LLC*, 572 F.Supp. 3d 641, 663 (E.D. Wis. 2021), *aff'd sub nom. Webber v. Armslist LLC*, 70 F.4th 945 (7th Cir. 2023) (rejecting 230 immunity because "[n]one of the nine claims … challenge the content of ads posted on the Armslist.com website";

rather, "[t]he plaintiffs have alleged that Armslist **should have structured [its] website differently**"); *Webber* at 956 (230(c)(1) "does not grant comprehensive immunity from civil liability for content provided by a third party, illustrated by the liability of information content providers for contributory infringement **if their system is designed** to help people steal … material in copyright") (emphasis added). Such a claim seeks only to hold the platform liable for its own decisions in prioritizing engagement over risks of grave harm known to it.

Stated specifically, this action seeks to hold Meta liable for its own conduct in designing a platform to elicit "emotional contagion" because "emotional contagion" is good for Meta's bottom line. [JA001-068 at JA035-037 (¶¶103-109)]. Like any other defendant, Meta is not immunized from liability for foreseeable risks of harm created or substantially contributed to by its *own* decisions and fault.

As well, in line with *Zeran*, the duty M.P. seeks to impose would require zero removal, alteration or monitoring of any content. It would require only reasonable design changes *to* Meta's *own*

product. To decide otherwise would be to immunize conduct (product design) over the internet that would be actionable *sans* internet for no other reason than transmission over the internet was involved. *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, n. 15 (9th Cir. 2008) ("we must be careful not to exceed the scope of the immunity provided by Congress and thus give online businesses an unfair advantage over their real-world counterparts, which must comply with laws of general applicability"); *Lansing v. S.W. Airlines Co.*, 980 N.E.2d 630, 638-39 (Ill. App. 1st Dist. 2012) (same). Product liability laws are "laws of general applicability" that apply to Meta's product like any other. And knowing failure to aid in stopping a conspiracy to violate civil rights does not lose its illegal character simply because the conspirators act through the internet. *See Roommates* at n. 24 ("[c]ompliance with laws of general applicability seems like an entirely justified burden for all businesses, whether they operate online or through quaint brick-and-mortar facilities") (holding Roommates.com liable for the *design* of its search engine actively facilitating wrongful third-party content).

If a physical product were designed to create or enhance the risk of physical or emotional harm to those who might encounter it, there would be no question that such a product case would be viable. This is precisely how defendants who have created other addictive products (such as tobacco or electronic cigarettes) were held to account. Just as in those landmark cases, M.P. does not seek to hold Meta vicariously liable for any third-party conduct. M.P. seeks to hold Meta liable for its own tortious conduct.

The courts can be forgiven for being hesitant in this arena, but it is becoming clearer and clearer that burying the proverbial head in the sand is dangerous and harming people. Artificial intelligence is becoming more sophisticated by the day. It is what Facebook uses to mine attention, addict users, and change their behavior. And only the companies who design the programs themselves have the power to curtail their harmful effects—they either build in safeguards that the machine cannot violate, or they don't. In the words of Tim Kendall, Meta's former Director of Monetization, Meta can either turn the dial up or turn it down. [JA060 (¶178)]. This is reality, regardless of whether or not the courts are ready to face it.

These platforms are meticulously designed, algorithm-and-AI-driven commercial *products* that foreseeably function as addiction and radicalization engines. *That is what they are designed to do.*[1] As well-pled in the Complaint, Meta has studied the human brain and how to "hack" it and has created a digital product that does just that by driving and exploiting chemical reactions in the brain; Meta has done so using the same tactics Big Tobacco did many decades ago. [JA038 (¶ 111)].

The District Court relied entirely on *Zeran*, ignoring the Fourth Circuit's later precedent set in *Henderson*. But much the reason *Henderson* was necessary, the District Court–like many before it, including cases cited in its opinion–stretched *Zeran*'s reasoning beyond its intended bounds. While the District Court's analysis was more-or-less a non-analysis and attempt to treat one of the most hotly contested issues in the nation as well settled, even some highly reasoned opinions have reached the erroneous conclusion

---

[1] *See, e.g.,* Lauer, David, *Facebook's ethical failures are not accidental; they are part of the business model*, AI & Ethics 1:395-403 (2021), available at https://link.springer.com/article/10.1007/s43681-021-00068-x.

independent social media platform design decisions, at least in some respects, are immunized under Section 230 as "publisher" conduct. *See In re Social Media Adolescent Addiction/Personal Injury Products Liab. Litig.*, 2023 WL 7524912 (N.D. Cal. 2023).

Luckily for M.P. and perhaps the Court (should it desire to stop the dangerous trend of giving the most powerful companies in the world a blanket pass to conduct their operations however they see fit), none of it is binding (neither this Court nor the Supreme Court has held social media algorithms immune from scrutiny under Section 230), none of it finds its exigence in the statutory text, and the notion independent product design decisions have blanket immunity under 230 is certainly not well-settled.

With the exceptions of *Force* and *Dyroff*, the District Court's cited authority does not even touch on the question of whether claims based on algorithm or platform design can or do enjoy 230 immunity. *See Force v. Facebook, Inc.*, 934 F.3d 53, 66 n. 20 (2d Cir. 2019); and *Dyroff v. Ultimate Software Group, Inc.*, 934 F.3d 1093 (9th Cir. 2019). And *Force* and *Dyroff* are distinguishable. *Force* explicitly declined to address the argument raised here—namely,

that the "algorithms are 'designed to radicalize.'" And both *Force* and *Dyroff* were not product liability cases. What the District Court saw as just "artful pleading" is straightforward application of generally applicable product liability law to known facts about how Meta *designs its own product to be harmful*. It is, rather, artful judging that has managed to couch anything and everything in any way involving content as little more than attempt to hold the platform liable <u>as</u> "publisher or speaker" of third-party content. Such views will inevitably (and have already) stretched the text's purported "immunity" language far beyond its breaking point. *See Roommates* at 1175 ("accepting [that the risk of getting a close case wrong is a justification for broader immunity] would inevitably lead to an endless broadening of immunity"). This is precisely what the talismanic waiving of *Zeran* by courts across the country has done.

The District Court also ignored language from its own cited cases (or later authority from those same courts) which, like *Henderson*, limits the ever-broadening scope of 230 "immunity." *See Roommates*, 521 F.3d at 1171 (correcting overbroad misinterpretation of *Carafano v. Metrosplash.com, LLC*, 339 F.3d

1119 (9th Cir. 2003), which was cited by the District Court: "[w]e disavow any suggestion that *Carafano* holds an information content provider *automatically* immune so long as the content originated with another"), *cf. Lemmon* (product design decisions are not insulated); *Lee v. Amazon.com, Inc.*, 291 Cal. Rptr. 3d 332, 376 (Cal. App. 1st Dist. 2022) (quoting the California Supreme Court) ("not all legal duties owed by Internet intermediaries necessarily treat them as the publishers of third-party content, **even when these obligations are in some way associated with their publication of this material … [w]e look instead to what the duty at issue actually requires**"); *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321-22 (11th Cir. 2006) (not a product case nor did it concern algorithm or platform design; while the District Court cited *Almeida* for its general recognition of *Zeran*'s *general* statement of what Section 230 immunity entails, it ignored the very next sentence of the opinion ("but even this broad statutory immunity does not apply without limitation") as well as *Almeida*'s recognition that Section 230 "shall [not] be construed to prevent any

State from enforcing any State law that is consistent with this section").

The same is true for the rest of the throw-away-cited cases on page 4 of the District Court's opinion [JA087]. The court did not parse these cases for what they stand for and none of them touched upon whether decisions to design a social media platform that causes foreseeable harm are actionable under Section 230. None involved product liability claims styled as such and relying upon ample factual evidence and scientific study that conclude these products *are independently designed* to do just that.

So, the question is: will this Court decide Meta's own platform (algorithm) design decisions are completely immune from suit? As the Court will see in its review of the jurisprudence, seemingly the majority of cases rely principally on *Zeran*'s oft-quoted observation (rather than statutory text) that Section 230 created "broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *See* Opinion below at p. 4 [JA087] (quoting, *inter alia*, *Zeran*). So to the extent this quote has been expanded upon in ways

perhaps unintended by this Court, one might say this Court has a moral imperative to correct the record.

To be sure, putting aside dispute over the use of the word "immunity," M.P. generally agrees with that quotation as a fair reading of Section 230(c)(1). But as this Court observed in *Henderson*, in keeping with many other courts across the country in the nearly 30 years since *Zeran* (decided before Facebook and the modern internet and its modern commercial structure even existed), this does not mean that anytime third-party content or publishing of content is a "but for" cause of the harm, the platform is immunized and cannot simultaneously be an independent cause of the harm through its own conduct. The analysis is more nuanced than that and requires case-by-case, detailed review of the particular facts pled to determine whether the plaintiff's claim *truly seeks* "[to] make service providers liable for information originating with a third-party user" or rather seeks to hold them liable for their own independent actions.

The District Court's curt and apathetic analysis simply checks the boxes (1) third-party content is involved and (2) Meta's

publication of that content is involved, so (3) Section 230 immunizes Meta. [JA087-089]. Sidestepping entirely the Complaint's well-pled facts, the District Court implies this case is just another instance of artful pleading by lawyers to try to get around Section 230. [JA088].

But the Complaint details that Meta's own product design decisions (notwithstanding that these decisions are connected to Meta's publishing activity in the sense the actual "publishing" is done by the end product of these decisions) are what caused foreseeable risk of the harm that caused injury to M.P. Stated otherwise, while the information published did contribute to the harm alleged, that "information originating with a third party user" is not the source of the liability M.P. seeks to impose upon Meta. The District Court grappled with not a single factual allegation, instead summarily dismissing them all as "artful pleading."

Whether "broad immunity" was intended or not (a matter of inter-circuit dispute),[2] this Circuit's (and extra-Circuit) case law establishes that the District Court must look at the particular facts

_____

[2] *See, e.g., Chicago Lawyers' Comm. for Civ. Rights Under L., Inc. v. Craigslist, Inc.*, 519 F.3d 666, 669-70 (7th Cir. 2008).

pleaded to determine whether imposing liability hinges on treating the platform as the "publisher or speaker" of third-party offending content or on the platform's own independent actions. As many courts have correctly observed, "publisher" activity is part of just about everything Meta and other such entities do, but that does not mean Meta's liability in any case that does involve "publishing activity" turns on its actions "as a publisher." *See, e.g., Lemmon* at 1092-93.

M.P. admits that if this Court, like some before it, decides to roll algorithm design decisions into/under the umbrella of immunized "publishing activity" by reasoning the product design is nothing more than automation of the act of publishing, M.P. loses.

But make no mistake that what that means is a broad-reaching decision immunizing Meta from any fault for (as pled) its own intentional decisions to design a product in a foreseeably harmful way, not for simply hosting another's harmful content. *See* [JA033-048 & 056-060: ¶¶ 98-102, 103] (Facebook's own researchers concluded: "**Our algorithms** exploit the human brain's attraction to divisiveness. … **If left unchecked** … [they feed users] more and

more divisive content in an effort to gain user attention [and] increase time on the platform."), 104-108, 109 (Facebook actually studied, tested and proved its own product's ability to elicit "emotional contagion"), 110, 111 (Tim Kendall's sworn testimony likening Facebook's design changes over time to those utilized by Big Tobacco to enhance the addictiveness and harmfulness of cigarettes), 112-119, 121-130, 131 (McNamee: "Facebook's culture, design goals, and business priorities made the platform an easy target for bad actors, **which Facebook aggravated with algorithms and moderation policies that amplified extreme voices. The architecture and business model that made Facebook successful also make it dangerous.**"), 132, 133 (ex-Meta VP for User Growth, Chamath Palihapitiya: "I think we have created tools that are ripping apart the social fabric of how society works"), 134-137, 164, 168, 172, 178.

M.P. does not "frame" these features as "content" (as the District Court suggested [*see* JA089], relying on *Dyroff* in which that *was* the plaintiff's theory). M.P. *accurately* describes them as *product design features* that are unreasonably dangerous and actionable

under generally applicable product law (much the same way the Meta insiders and experts referenced in the Complaint describe them). Neither these disinterested witnesses nor M.P. are playing some kind of semantic game; it is the courts who must re-craft language and logic to bend these claims within Section 230's scope. And as long as Section 230 is overbroadly and improperly interpreted to insulate defendants like Meta from product liability actions based not on their roles as "publishers" of third-party content but on their roles as developers of unreasonably dangerous products, Meta will only go further in manipulating users for its own gain and at the users', society's, and terror victims' (like M.P.) expense.

Section 230's text does not demand such a result. Nor would the result M.P. urges require rejecting or overruling the views and opinions of myriad other courts, including this Court's own in *Zeran* and even *Force*, since the Second Circuit treated as waived (and thus did not rule on) the argument that Meta's platform was "designed to radicalize." *See Force,* 934 F.3d 53, n. 1, *ante* (it also

should not be ignored this Court already rejected *Force*'s overbroad "but for" approach).

Zeran[3] and *Nemet Chevrolet Ltd v. Consumeraffairs.com Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) both addressed classic Section 230 "immunity" scenarios that are completely distinguishable. Both dealt with allegations the platform *failed to remove and monitor* actionable third-party content and thereby became liable *for that content. See Zeran* at 328; *Nemet* at 252.[4] Again, this case challenges Meta's conduct in designing its own product and in no

---

[3] 129 F.3d 327 (4th Cir. 1997). The internet at the time of *Zeran* (1997) is unrecognizable to the modern internet world. It predates algorithms like those at issue here, it predates Facebook by 8 years as well as Google, and it certainly predates the sophisticated tools built into social media products to machine-learn, addict, manipulate and modify users' thinking and behavior. *See* Bergman, *Assaulting the Citadel of Section 230 Immunity: Products Liability, Social Media, and the Youth Mental Health Crisis*, 26 Lewis & Clark L. Rev. 1159, 1178 (2023).

[4] The only other Fourth Circuit precedent Meta relied upon below is similarly distinguishable. *See Westlake Legal Grp. v. Yelp, Inc.*, 559 F. App'x 481, 485 (4th Cir. 2015) (no product liability claims asserted; the plaintiff was trying to couch Yelp as a contributing "content provider"); and *Cox v. Twitter, Inc.*, 2019 WL 2513963, at *3 (D.S.C. 2019) (also no product liability claims asserted; the plaintiff sought to hold Twitter liable for banning/censoring his account).

way calls upon Meta to better monitor, alter, remove or do anything at all with any third-party content.

The District Court relied entirely on *Zeran* and ignored this Court's later precedent of *Erie Ins. Co. v. Amazon.com* and *Henderson v. Source for Pub. Data, LP*, both of which appear to be attempts to correct overbroad applications of *Zeran* along the lines of the very distinction M.P. urges. *See Erie*, 925 F.3d 135, 139-40 (4th Cir. 2019) ("While the [CDA] protects [an ISP] from liability *as a publisher of speech*, it does not protect them from liability as the seller of a defective product.") (emphasis in original); *Henderson*, 53 F. 4th 110, 122-23 (4th Cir. 2022).

Ignoring *Henderson* is curious since (1) it explicitly rejected *Force* (which the District Court relied heavily upon); (2) it appears to be at the very least an important clarification of *Zeran* (the District Court's starting and, really, ending point of its analysis). In *Henderson*, this Court explained publisher liability really has two requirements. Information dissemination (or the fact that it is involved) is "not enough" to conclude the platform defendant is immune under Section 230. Rather, a claim does not seek to hold

the defendant liable "as the publisher or speaker" of that information unless it, second, "seeks to impose liability based on that information's improper content." *Id.* at 121, 129 ("Section 230(c)(1) … does not insulate a company from liability for all conduct that happens to be transmitted through the internet. Instead, [it] extends only to bar certain claims, in specific circumstances, against particular types of parties."). And most importantly, again rejecting *Force*, *Henderson* rejected the notion "a claim treats an entity as the 'publisher' under Section 230(c)(1) if liability hinges in any way on the act of publishing." *Id.* at 122-23 ("This but-for test bears little relation to publisher liability at common law. To be held liable for information 'as the publisher or speaker' means more than that the publication of information was a but-for cause of the harm.").

In short, this Court's precedent is consistent with the view that claims like those here are viable because Section 230 prohibits *derivative liability* for third-party speech, not claims that seek to hold a social media defendant liable *for its own conduct* in its role as *product manufacturer or developer*. In such a situation, "[t]o

make this determination [whether the claim treats the defendant as 'publisher or speaker'], we look to see what the plaintiff in [the] case must prove." *Henderson* at 124.

Nowhere in the elements of a South Carolina product liability claim is there any necessity that M.P. prove Meta was the publisher or speaker of any content, let alone improper content.[5] And M.P's well-pled allegations against Meta make clear her product-based case does not hinge on Meta's publication of improper content but on Meta's product design decisions that are independent of the dissemination of any content. In the parlance of the above-discussed case law, to meet its duty as alleged by M.P., Meta would not need to remove, censor, better monitor, or otherwise alter or do anything with any content. Rather, to meet its duty, Meta would only have to alter the design of *its own product* to reduce the unreasonable risk of psychological manipulation or "emotional contagion" of users that the product – independent of any particular content—is designed to foster. As *Henderson* and *Erie* suggest, Section 230 does not touch such claims. If the defendant's liability

---

[5] *See* S.C. Code Ann. § 15-73-10.

does not depend on the content of another's speech, but rather on its own independent conduct, a state law action so premised "is consistent with" Section 230 and not precluded.

To the extent the District Court relied on extra-Circuit cases that do not comport with *Henderson* (like *Dyroff* and *Force*), they are not controlling, but the District Court also overstated the consistency of extra-circuit case law on the subject. For example, while citing *Dyroff*, the court ignored *Lemmon* (decided by the 9th Circuit two years later), which like *Henderson*, rejected the notion content being a proximate cause of the harm prevents product claims asserting the design of a social media platform independently contributed to the harm:

> That Snap allows its users to transmit user-generated content to one another does not detract from the fact that the Parents seek to hold Snap liable for <u>its role</u> in violating <u>its distinct duty</u> to <u>design a reasonably safe product</u>. As in *Internet Brands*, Snap "acted as the 'publisher or speaker' of user content by" transmitting Landen's snap, "and that action could be described as a 'but-for' cause of [the boys'] injuries." 824 F.3d at 853. This is unsurprising: Snap "is an internet publishing business. Without publishing user content, it would not exist." *Id*. <u>But though publishing content is "a but-for cause of just about everything" Snap is involved in, that does not mean that the Parents' claim, specifically, seeks to hold Snap responsible in its capacity as a</u>

"publisher or speaker." *Id*. **The duty to design a reasonably safe product is fully independent of Snap's role in monitoring or publishing third-party content**. (emphasis added)

995 F.3d at 1092.

The District Court similarly disregarded *Doe v. Mindgeek USA Inc.*, 574 F. Supp. 3d 760, 771 (C.D. Cal. 2021), which observed that claims based on defective design of an internet platform survive Section 230 notwithstanding the fact that third-party actions on the platform were a necessary, but-for cause of the ultimate harm. *Doe v. Mindgeek USA Inc.*, 574 F. Supp. 3d 760, 771 (C.D. Cal. 2021) (abrogated on other grounds concerning a statute not relevant here)

Other cases cited below by Meta are also consistent with M.P.'s position and *Henderson. See Fields v. Twitter*, 217 F. Supp. 3d 1116, 1121 (N.D. Cal. 2016), *aff'd*, 881 F.3d 739 (9th Cir. 2018) ("courts must ask whether **the duty the plaintiff alleges** the defendant violated derives from the defendant's status or conduct as a publisher or speaker"); *Doe v. Snap, Inc.*, 2022 WL 2528615 (S.D. Tex. 2022) (approving *Lemmon*'s basic premise that product design decisions can support liability claims against social media

platforms **even when content plays a role in the harm**). M.P.'s allegations mirror those in *Lemmon* and rely upon Meta's status as a product manufacturer, not as a publisher or speaker of third-party content. Of course, the content played a causal role in radicalizing Roof, but that does not detract from Meta's design having played an *independent* and substantial role in manipulating and driving him to extreme thinking and behavior.

Views like "algorithm design" is just "automated publishing activity" immunized by Section 230 "have produced an immunity from liability that is far more sweeping than anything the law's words, context and history support." *See* CITRON & WITTES, *The Internet Will Not Break: Denying Bad Samaritans § 230 Immunity*, 86 Fordham L. Rev. 401, 408 (2017). This Court, many 9th Circuit presiding judges, Chief Judge Katzman of the Second Circuit (in his influential dissent in *Force*),[6] and at least JUSTICE THOMAS all

---

[6] For a good discussion of how *Force*'s blanket proposition is limited (from within *Force*'s own jurisdiction and along lines that support M.P.'s case here), *see* the Southern District of New York's reliance on C.J. Katzmann's dissent and direct limitation of the impact of *Force*'s ruling in *Nat'l Coalition on Black Civic Participation v. Wohl*, 2021 WL 4254802, at *9-10 (S.D.N.Y. 2021). *See also Doe #1 v. MG Freesites, LTD*, 2022 WL 407147, at *17 (N.D. Ala. 2022)

appear to agree. *See Henderson*; *Lemmon*; *Gonzales v. Google*, 2 F.4th 871 (9th Cir. 2021); *Force*, 934 F.3d at 76-89 (KATZMANN, C.J.); *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S.Ct. 13, 17 (2020) (THOMAS, J.) ("A common thread through all of these cases is that the plaintiffs were not necessarily trying to hold the defendants liable 'as the publisher or speaker' of third-party content … **Their claims rested instead on alleged product design flaws—that is, the defendant's own misconduct**.") (emphasis added)).

A decision to immunize platform design decisions of entities like Meta from scrutiny is precisely the type of ever-broadening view of Section 230's scope that will create (and already has) "a lawless no-man's-land on the Internet." *See Doe v. Internet Brands, Inc.*, 824 F.3d 846, 852-53 (9th Cir. 2016) ("Congress has not provided an all

_____

(distinguishing *Force*) ("The facts of this case are unlike those cases in which neutral search tools or algorithms were misused by bad actors. … Here, the allegations are that Defendants' tools themselves function in a way to direct users to CSAM in particular, as opposed to treating CSAM the same way that lawful videos on Defendants' websites are treated."). **Those allegations are functionally indistinguishable from those alleged against Facebook by M.P.**

purpose get-out-of-jail-free card for businesses that publish user content on the internet…"). This Court should take this opportunity to prevent that.

### III. M.P. has pleaded a plausible claim for relief under 42 U.S.C § 1986.

To state a claim for conspiracy to deny equal protection of the law under 42 U.S.C. 1985(3), a plaintiff must plausibly allege:

> (1) a conspiracy of two or more persons,
>
> (2) who are motivated by a specific class-based, invidiously discriminatory animus to
>
> (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all,
>
> (4) and which results in injury to the plaintiff as
>
> (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995).

The conspiracy alleged among the Russian Defendants meets the elements and pleading requirements of a Section 1985(3) claim. As to Meta, the Complaint alleges it knew about the fake accounts and racially based animus and race war the Russian Defendants were targeting on South Carolina and other States with prior history of racial unrest, and yet failed to take any action "to prevent

or aid in preventing the commission of" the Russian Defendants'
conspiracy. [JA008-009, 019-024, 048, 052-53, 063-065]: ¶¶ 18-19,
52, 62-64, 71, 137 ("Facebook well knew, long before Roof, that its
platform was an incredibly effective disinformation and
propaganda tool for ... Russian state operatives..."), 149 ("Facebook
had some knowledge of these fraudulent accounts but did little to
control, limit, or prevent the nefarious activities of the Russian
Defendants. It was not until September 2017 that Facebook
*publicly reported* that they had identified Russian expenditures on
their platforms to fund social and political advertisements [and it
is unknown when exactly Facebook reported same to U.S.
authorities, as it claims]. ... Facebook had prior knowledge and
knew that there were fake accounts that were coordinating activity
among inauthentic and connected accounts in an effort to
manipulate public opinion. ..."), 205-207 ("Upon information and
belief, [Meta] participated in the conspiracy insofar as they had
direct knowledge of and/or wilfully blinded themselves to clear
evidence of rampant and fraudulent misuse of [its] products by
Russian and other foreign actors for the purpose of interfering in

U.S. elections, including interfering with the right of African Americans to vote and/or otherwise depriving African Americans of their civil rights.").

Under 42 U.S.C. 1986, which the District Court ignored, a cause of action arises against anyone who has knowledge of a Section 1985 conspiracy and who, "having the power to prevent or aid in preventing the commission of" acts pursuant to that conspiracy, "neglects or refuses so to do." 42 U.S.C. § 1986. "Section 1986 claims are therefore derivative of § 1985 violations." *Park v. City of Atlanta*, 120 F.3d 1157, 1159–60 (11th Cir. 1997). Section 1986 reaches more broadly than its predicate by inculpating bystander defendants who are not themselves conspirators under Section 1985. It is unique among our civil rights statutes in imposing liability when a defendant has neither personally committed a discriminatory act, nor engaged in a conspiracy to do so, nor acted with discriminatory intent. The statute creates a legal duty. A negligent failure to protect by a company like Meta with knowledge of a Section 1985 conspiracy and power to protect its victims is actionable. *Clark v. Clabaugh*, 20 F.3d 1290, 1298 (3rd

Cir. 1994) (finding that negligence is sufficient to maintain § 1986 claim).

Under Section 1986:

Every person who, <u>having knowledge</u> that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, <u>and having power to prevent or aid in preventing</u> the commission of the same, <u>neglects or refuses so to do</u>, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented.

42 U.S.C. § 1986.

In this case there is no reasonable question of fact regarding the existence of a Section 1985 conspiracy, especially targeted to certain states including South Carolina, by these several Russian companies and the now deceased Yevgeny Prigozhin. We can say this because there has been an extensive inquiry by DOJ Special Counsel Mueller resulting in a multi-thousand-page report that lays the facts out in great detail. We also know this because prior to his death Mr. Prigozhin openly admitted to such actions and threatened to continue to do the same. But M.P.'s Complaint also included sufficient facts to support a Section 1986 claim against

Meta. *See* [JA008-009, 019-024, 048, 052-53, 063-065]: ¶¶ 18-19, 52, 62-64, 71, 137, 149, 205-207.

In its haste to grant Meta's motion, the District Court completely failed to consider the Section 1986 claim, instead only analyzing whether a valid Section 1985(3) claim had been pleaded against Meta. The District Court went further astray in referencing the Anti-Terrorism Act and the recent Supreme Court ruling in *Twitter v. Taamneh*, 143 S.Ct. 1206 (2023), which held—**under a very different statute**—that a social media provider could be held liable only upon a showing that it "consciously, voluntarily, and culpably" participated in a terrorist act." *Twitter v. Taamneh*, 143 S.Ct. 1206 (2023). Obviously, the ATA's "aiding and abetting" standard is far more stringent than Section 1986's knowing failure standard, which requires only that Meta had knowledge of a conspiracy to deny civil rights protected by § 1985(3) and failed to take some affirmative steps to prevent the conspiracy from being carried to fruition, whether by attempting to intervene themselves, reporting the matter to lawful authorities, or other affirmative measures. *See Park v. City of Atlanta*, 120 F.3d 1157 (11th Cir.

1997) (Section 1986 does not require defendants "share in the discriminatory animus with members of the conspiracy").

It is incontrovertible that Dylann Roof interacted with Facebook as a user; as a "lone wolf" who was "self"-radicalized online following a Google search that highlighted black violence against whites, the role of Facebook as the public square for Roof cannot be understated. [JA057-062]. We do know Roof was comfortable enough with what his interaction was with Facebook to upload a photograph of himself with a Rhodesian flag (recognized sign of white supremacy). [*Id.*]. What he saw on Facebook and the overall increased level of racial animus from the massive infiltration of racially based hate by the Russian Defendants served to affirm Roof's racially based hate toward African Americans and confirmed Roof's feeling that not enough was being done to address the dangers to the white race. [*Id.*]. The Russian Defendants understood the effect their infiltration of Facebook had in increasing racial animus in the U.S. [*Id.*]. Applying Section 1986, it is for the jury to decide whether Meta was negligent in its failure to do anything once it became aware of the Russian Defendants'

manipulation of its platform to incite racial animus in South Carolina. [*Id.*].

The District Court made no mention of Section 1986 in its opinion. [JA073]. But the court was **required** to do so per federal "notice pleading" standards, since (1) all necessary facts supporting a 1986 claim against Meta (knowledge, ability to prevent/aid in preventing, and negligence in failing to do so) were pled [see discussion above], (2) M.P. made a 1986 argument based on those facts in her Opposition to Meta's Motion to Dismiss [*see* R.Doc. 32 at p. 34-35], and (3) it is legal error to treat a claim as not pled (which is presumably what the District Court's silence meant it did) simply because a particular statute or rule was not identified in the Complaint. *See Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008) ("[n]otice pleading requires the plaintiff to set forth in his complaint claims for relief, not causes of action, statutes or legal theories"; "[a] complaint need not identify the statutory or constitutional source of the claim raised in order to survive a motion to dismiss"). Federal procedure requires M.P.'s Complaint be tested under any theory (so raised in response to motion practice) that could support a valid

claim. Since M.P. did raise Section 1986, for this reason alone the District Court's decision to dismiss Meta from the case must be overturned.

## IV.    Social media platforms are "products."

Should this Court agree that either of the District Court's stated bases for its decision (addressed above) was incorrect, the remaining arguments the District Court ignored should be addressed by the District Court in the first instance on remand. But should this Court exercise authority to address them, M.P. addresses the rest of Meta's arguments below, beginning with Meta's argument its platform is not a "product" subject to state product liability laws.

Outside of litigation, Meta has always called its products, interchangeably, social media "platforms" or "products" and described its business as the creation of social media "products" for public consumption. It used the term "products" 513 times in its 10-K annual report to the SEC to refer to Facebook and its other

*products.*[7] But since its § 230 "liability shield" has faced increasing attack, Meta has sought to redefine its products as "communication services." The purpose of this self-serving self-reinvention is to try to take advantage of what Meta's lawyers see as a strict dividing line between "tangible" and "intangible" things for purposes of applying product liability law. Even at face value, Meta's argument misstates the law.

First, the "services" in cases into which Meta seeks to fit itself are markedly different. Meta is not a surgeon incidentally providing surgical implants as part of medical care, nor a building contractor who provides primarily a service., etc. It is an algorithm *designer* that designed its software to be addictive and dangerous. It provides, to its users, finished social media **products.** And these products, though only *quasi*-tangible (they are software products downloaded as "apps" and, as such, *tangibly* exist within individual users' devices), are fully capable of causing and do foreseeably cause

---

[7] Meta Platforms, Inc. Form 10-K Annual Rep. (Feb. 2, 2023) (*see, e.g.*, p. 3: "The term 'Family' refers to our Facebook, Instagram, Messenger, and WhatsApp ***products*.***"*), available at: https://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/e574646c-c642-42d9-9229-3892b13aabfb.pdf

significant harm to users and other downstream victims. The harms also stem not merely from the content consumed (or intangible "ideas or expression"), but from the meticulously designed features of these products that make them highly sophisticated psychological manipulation devices. The cases Meta cites for its "product vs. service" argument are really more about the provider and that provider's role (*e.g.*, mechanic, surgeon, pharmacist, other professional/skilled-*labor* roles that don't typically involve sale or "injection" into commerce of products *developed by them*); they have little, if anything, to do with the thing itself and whether that thing is a "product" (there was no question a breast implant, a tire assembly, a pharmaceutical drug, etc. were products, it was just the person/entity being sued was not the seller). Meta is readily distinguishable. Meta is in the business of injecting its social media products into the global stream of commerce. It doesn't install its apps for users or otherwise provide professional services to which its products are merely incidental. The products are what Meta does. Meta is a software product manufacturer.

Second, Meta is simply wrong, and misleading in the extreme, to suggest there is no measurable basis for determining its social media products were defectively designed or that, otherwise, the policy goals underlying products law do not apply. Deterrence, reliance and the superior ability of Meta to insure and project financial losses from its product design defects and spread the costs/losses caused thereby are all present.[8]

South Carolina has adopted the Restatement (2d) of Torts § 402A and the comments thereto. *See* S.C. Code Ann. §§ 15-73-10 and 15-73-30 ("Comments to § 402A … are incorporated herein ..."). § 402A's application is not strictly limited to "tangible" things like lawnmowers and toasters. In particular, states that follow it have recognized software or computer programs as "products" capable of being unreasonably dangerous and thus subject to product liability law.

---

[8] *See* Bergman, *Assaulting the Citadel of Section 230 Immunity: Products Liability, Social Media, and the Youth Mental Health Crisis*, 26 Lewis & Clark Law Rev. 1159, 1172 (and fns. 85-92) & 1190-94 (2023).

The principal South Carolina authorities referenced by Meta to support its position that state law would treat Facebook as a service rather than a product do not address any such question. As noted, these cases are about categorizing the provider-defendant being sued, not defining the thing that caused harm and none of the defendants in these cases even slightly resemble Meta.[9] On the other hand, that this "tangible" vs "intangible" distinction is not what Meta makes it out to be is driven home by the fact that South Carolina considers electricity to be a product once it has been "injected into the stream of commerce." *Priest v. Brown*, 302 S.C. 405, 411, 396 S.E.2d 638, 641 (Ct. App. 1990). Certainly, Facebook (which is downloaded on users' devices, stores user information, and is actually seen, touched and interacted with by the user in the

---

[9] *See Fields*, 376 S.C. 545 (holding a home building contractor, although he is hired to supply a finished, built home, is "*primarily*" a service provider and the primary object of the contractor-consumer agreement is one for a service); *In re Breast Implant Prod. Liab. Litig.*, 503 S.E.2d 445 (S.C. 1998) (holding the surgeon who inserts breast implants is *primarily* providing a service (surgery), even though the surgery incidentally involves the delivery of a third-party product (the breast implant)); *DeLoach v. Whitney*, 273 S.E.2d 768 (S.C. 1981) (tire valve stem installer provided a service, not a product – he was not a seller of tires or their component parts, but a true service provider).

normal course of use – *i.e.*, the user clicks the app, opens it, physically does things in it) are more "tangible" than electricity, which is usually not touched or handled in any way by the user or consumer.

Many extra-circuit cases hold intangible software products can be subject to product liability law. *See In re Social Media*, 2023 WL 7524912, at *19-21; *Hardin v. PDX, Inc.*, 227 Cal.App. 4th 159, 171 (2014) (rejecting contention "'information' is not a 'product'" because "[plaintiff's] theory is that *PDX's software program*, not the information it produces, is the defective product"); *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092-93 (9th Cir. 2021); *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 929–30 (N.D. Cal. 2021), *abrogated on other grounds by Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137 (9th Cir. 2022) (endorsing *Lemmon's* holding social media *products* can be subject to product law); *Simulados Software, Ltd v. Photon Infotech Priv., Ltd.*, 40 F.Supp. 3d 1191, 1199 (N.D.Cal. 2014) ("Generally, courts have found that mass-produced, standardized, or generally available software, even with modifications and ancillary services included in the agreement, is a good that is covered by the UCC.").

Again we need only look to Meta's own public statements: it describes its platforms as "products" that are both standardized and generally available, and as for mass production, its corporate goal is "[t]o build a *product* that connects people *across continents and cultures.*"[10]

Meta relies heavily on the 9th Circuit case that created this "product-vs-service" distinction but omitted from its argument that *Winter* excluded "computer software" from what it deemed "services" or "intangibles" that can never be subject to product law. *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1036 (9th Cir. 1991). Meta also cited *Estate of B.H. v. Netflix, Inc.*, 2022 WL 551701, at *3 (N.D. Cal. 2022), but Judge Gonzales-Rodgers has now rejected the position that *Netflix* somehow establishes software like Meta's is not subject to product liability law. *In re Social Media*, 2023 WL 7524912, at *26-27.

---

[10] Rob Goldman, *Hard Questions: What Information Do Facebook Advertisers Know About Me?*, META (Apr. 23, 2018), https://about.fb.com/news/2018/04/data-and-advertising/.

Many courts have held that *social media platform* software, specifically, is a product. *A.M. v. Omegle.com, LLC*, 2022 WL 2713721 at *4 (D.Or. 2022) ("Plaintiff alleges Omegle is defectively designed… **In order to meet the obligation A.M. seeks to impose on Omegle, Omegle would not have to alter the content posted by its users—it would only have to change _its design and warnings_**.").

Texas and Louisiana have also recognized computer software as "products" and Georgia, in a case almost identical to *Lemmon*, also applied Restatement (Second) Section 402A to a social media platform.[11]

---

[11] *See Hou-Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103, 107 fn. 2 (Tex. App. 2000) ("We accept that the SeisVision software is a product"); *Schafer v. State Farm Fire & Cas. Co.*, 507 F. Supp. 2d 587, 600–01 (E.D. La. 2007) ("A product is defined as 'a corporeal movable that is manufactured for placement into trade or commerce …' LA.REV.STAT. ANN. § 9:2800.53. **The Louisiana Supreme Court has held that computer software is a corporeal movable**. … Moreover, other courts and legal scholars have suggested that defective computer software may give rise to strict products liability in tort. *See* Restatement (Third) of Torts: Prod. Liab. § 19 (1998); *see also Winter[*, 938 F.2d at 1035]"); *Maynard v. Snapchat, Inc.*, 816 S.E.2d 77 (Ga. Ct. App. 2018).

The simple fact is the idea sophisticated products like machine-learning, algorithm-driven social media platforms should be treated more like the provision of surgical services, mechanic services, or any other *professional* or *skilled-labor-type* services than what they are (highly-engineered, purpose-driven products) does not pass the smell test. Decontextualizing commentary that product law *generally* deals with the "tangible" over the "intangible" cannot change the reality–Meta engineers and delivers software *products* for public consumption that are now widely known to carry myriad unreasonable risks of harm. As understanding of how these highly-engineered social media products operate has grown, the proposition they are not, should not or cannot be considered "products" has proven hollow.

JUSTICE THOMAS has also indicated that product liability claims can be viable against products like Facebook. *See Malwarebytes*, 141 S.Ct. at 17 (quoted in Section I, *supra*). Likewise, the strong dissent(s) to the 9th Circuit's decision in *Gonzalez*,[12] particularly

_____

[12] N.b., every member of the 9th Circuit panel expressed misgivings about the increasing breadth with which § 230 has been construed by lower courts.

that of Judge Gould, recognized traditional products liability theories should be a viable avenue to hold social media companies liable for harms caused by design of their products. 2 F.4th at 938.[13]

These platforms "operate on complex computer algorithms that are invisible and incomprehensible to ordinary users"–this "wide disparity of information" between the user and the manufacturer squarely brings into play the public policy imperative that liability be affixed "on the party in the best position to reduce the hazards to life and health posed by [the product]." Bergman at 1190. Additionally, "based on their design, operation, and monitoring algorithms that fuel consumers' use of their products, social media companies can anticipate many hazards and guard against the recurrence of others while the public cannot." *Id*. at 1191. The overwhelming cost of injury can also best be insured by social media

---

[13] Judge Gould wrote: "[M]anufacturers are responsible in tort if they make unreasonably dangerous products that cause individual or social harm. ... **Here and similarly, social media companies should be viewed as making and 'selling' their social media products**.... **If social media companies use 'neutral' algorithms that cause unreasonably dangerous consequences, under proper standards of law … they might be held responsible**."

product manufacturers "as a cost of doing business." *Id*. And the magnitude of the risk (spurring acts of terrorism and otherwise negatively affecting youth mental health on a global scale) certainly merits the best protection the law can provide and which Meta is best positioned to provide. And the "insurance goal" or, more generally stated, "the interest of economic efficiency" would also be served by applying product law to social media products and thereby forcing the social media manufacturers to pay closer attention to the balance struck between harm risks and profit goals. *Id*. at 1191-92.

Whistleblowers have revealed Meta meticulously tests and inspects its products, constantly tweaks them and also performs internal studies (using its users as lab rats) of their effects, and doesn't just disregard or disclaim any legal duty, but actually uses the learned information to make its products *ever more harmful and addictive*, showing complete disdain for any notion it has a duty to not create products that pose an unreasonable risk of harm. The notion Meta's social media platforms are not "products" subject to

product liability law is just plain wrong as a matter of law, policy, and common sense.

## V.     M.P. has plausibly alleged causation.

Facebook would have this Court ignore the concepts, well established under state law, of "concurrent" and "substantial factor" causation in determining whether its fault was a *cause-in-fact* of Plaintiff's harm.

But putting aside *how* the evidence (which M.P is due in discovery before the well-pled claims can be tested on the facts) will connect the dots in the radicalization of Roof, what Meta ignores is M.P need not plead Facebook was the sole (but for) cause of Roof's actions to survive the pleading stage. M.P need only plead, and has sufficiently pled, Facebook played a critical role and how it played a critical role in Roof's radicalization and the foreseeable and grave harm it caused to M.P and countless others.

In a South Carolina product liability action, a plaintiff must allege "the product defect proximately caused [her] injuries." *Little v. Brown & Williamson Tobacco Corp.,* 243 F. Supp. 2d 480, 498 (D.S.C. 2001). In turn, "[p]roximate cause requires proof of (1)

causation in fact and (2) legal cause." *Id.* "Typically, a plaintiff may prove causation in fact by establishing that the injury would not have occurred 'but for' the defendant's negligence." *Id.* But South Carolina also recognizes "substantial factor" causation. *See Little*, 243 F. Supp. 2d at 498 (quoting *South Carolina Ins. Co. v. James C. Greene and Co.,* 290 S.C. 171, 348 S.E.2d 617, 620 (1986)).

It must be inferred from M.P.'s well pled allegations that Facebook plausibly be determined a substantial contributing factor to Roof's process of online radicalization leading to offline violence. As such, this is not a pleading matter but one for trial or evidentiary motion practice.

As to "proximate" cause, it has been well pled and must be accepted as true that Meta was and had been well aware of its algorithms' dangerous propensity to radicalize users online and thereby directly spark offline violence. [JA006]. The magnitude of the violence, the particular underlying animus for it, or the particular heinousness of the crime does not make it unforeseeable as a matter of law. Nor is M.P. required to prove Meta should have foreseen the particular harm or type of harm that occurred. Finally,

this question is particularly unsuitable for decision at the pleading stage, especially in light of the facts pled.

The touchstone of proximate cause analysis is foreseeability: "legal cause [is] proved by establishing foreseeability." *Jolly v. Gen. Elec. Co.*, 435 S.C. 607, 624, 869 S.E.2d 819, 828 (Ct. App. 2011); *Wallace v. Owens-Illinois, Inc.*, 300 S.C. 518, 520, 389 S.E.2d 155, 156 (Ct. App. 1989). "The test of foreseeability is whether some injury to another is [a] natural and probable consequence of the complained of act." *Id.* at 521. \

The wrongful act alleged is the design of a product, purposefully, to drive users to extreme negative emotions and views. Whistleblowers have testified under oath, and M.P has properly pled, Meta was aware this was occurring and consciously and willfully *enhanced its product to promote it further*.

Online radicalization that results in offline violence is an eminently foreseeable result of designing a product as such *and for such purposes–i.e.*, this is exactly what happens when you design a product to psychologically manipulate and drive users to extremes. For Meta to argue otherwise is a slap in the face to victims who

have now heard under oath before Congress Meta knew what it was doing and did it anyway (in many different ways and with many, varying, and foreseeable harmful results to millions, including victims of terrorist violence the world over). "[I]f the character of the intervening act … was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrongdoer, the causal connection is not broken …" *Oliver v. S.C. Dep't of Highways & Pub. Transp.*, 309 S.C. 313, 317, 422 S.E.2d 128, 131 (1992). Facebook "can and should do more"–it can start by dropping the act it does not know the power of its own technology to cause evil on massive scales.

Moreover, intervening *criminal* acts (even those as appalling as Roof's) are not, as a matter of law, superseding events that break the causal chain. First, "it is not necessary for the [defendant] to have been able to foresee the *particular* event which occurred"; rather, "[i]t is enough [he] should have contemplated the probable happening of some accident of this kind … and … **cannot shelter himself behind the defense that the <u>actual</u> consequence was**

**one that <u>rarely</u> follows from that particular act**." *Oliver*, 309 S.C. at 317 (emphasis added). Subsequent *negligence* of a third-party is almost always deemed foreseeable. *See, e.g., Bishop v. S.C. Dep't of Mental Health*, 331 S.C. 79, 89, 502 S.E.2d 78, 83 (1998). But the rule for intervening *willful, malicious or criminal* acts is the same, just worded differently: "The general rule of law is that when, between negligence and the occurrence of an injury, there intervenes a willful, malicious, and criminal act of a third person producing the injury, but that such was not intended by the negligent person **and could not have been foreseen by him**, the causal chain between the negligence and the accident is broken. *Stone v. Bethea*, 251 S.C. 157, 162, 161 S.E.2d 171, 173-74 (1968). As pled, Meta knows the power of its technology and that technology's global reach and capacity for social contagion and radicalization of users, such that it would be an injustice to say, *as a matter of law*, Roof's actions were not a foreseeable result of design flaws Meta knew could cause exactly that.

"Ordinarily, the question of proximate cause is one of fact for the jury[,] and the [circuit court's] sole function … is to inquire

whether particular conclusions are *the only* reasonable inferences that can be drawn from the evidence." *See Jolly*, 435 S.C. at 624; *Oliver*, 309 S.C. at 317 ("[L]egal cause is ordinarily a question of fact for the jury. Only when the evidence is susceptible to only one inference does it become a matter of law for the court."). It is for the jury to decide (1) whether Meta should have foreseen mass violence from online radicalization resulting from its product design, and (2) whether notwithstanding same, it should get a pass because the violence committed was just too outrageous and appalling.

## VI.  M.P. has plausibly alleged a duty owed to her by Meta.

In an action alleging negligence under South Carolina law, a plaintiff must show (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached the duty by a negligent act or omission, (3) the defendant's breach was an actual and proximate cause of the plaintiff's injury, and (4) the plaintiff suffered injury or damages. *Dorrell v. S.C. Dep't of Transp.*, 361 S.C. 312, 318, 605 S.E.2d 12, 15 (2004). Plaintiff being a foreseeable victim of a foreseeable type of harm caused by Meta's defective product

establishes a tort duty in negligence (negligence is but one form of a proper product liability action under South Carolina law).

Meta attempts to limit its duty by narrowly defining "user or consumer," but that finds no support in South Carolina products liability law. Under South Carolina law, the determination of who constitutes a "user" for purposes of imposing strict liability upon a product manufacturer or seller requires a case-by-case analysis. *Lawing v. Univar, USA, Inc.*, 415 S.C. 209, 781 S.E.2d 548 (S.C. 2015). S.C. Code Ann. § 15–73–10 (2005) does not define "user" (or "consumer" for that matter). Instead, the General Assembly expressly adopted the comments to Restatement Section 402A— which discuss the meaning of "user." *See* S.C. Code Ann. § 15–73–30 (2005).

Comment *i* to Restatement § 402A, titled "User or consumer," provides in pertinent part:

> In order for the rule stated in this Section to apply, it is not necessary that the ultimate user or consumer have acquired the product directly from the seller... **It is not even necessary that the consumer have purchased the product at all**. He may be a member of the family of the final purchaser, or his employee, or a guest at his table, or a mere donee from the purchaser. (emphasis added)

Restatement (Second) of Torts § 402A comment *i*.

"User" under South Carolina products law clearly includes those in the zone of danger of the final purchaser, such as a family member, employee, guest, donee, or otherwise, and "consumer" also includes in its scope downstream victims beyond "those who in fact consume the product." *See id.* and cases *infra*. Even direct contact with the product (*i.e.*, actual use or consumption as Meta argues) is not required.

Just as the term "sale" or "seller" is "merely descriptive" and no actual sale is required, the merely descriptive terms "user or consumer" are not so limiting with respect to the scope of foreseeable product victims. *See Comm. of Pub. Works of City of Charleston v. Costco Wholesale Corp.*, 2021 Wl 5908758, at *4-5 (D.S.C. 2021) (not being a "user or consumer" (as Meta would define) did not bar the action; the plaintiff was the City Public Works Department that had to deal with clogging of city pipelines by the flushing of defective wipes by "users or consumers"; the City did not purchase, use or consume the wipes but *foreseeably* came into contact *with their harmful effects* on its sewer system).

M.P.'s exposure to harm from Facebook is not meaningfully distinguishable. That radicalization through social media can and often does result in violent harm befalling those a step removed from actual "use" of the product is foreseeable, and that such downstream harms can be remedied under South Carolina product law. Facebook is defective in such a way as to foreseeably and directly cause the exact type of harm alleged. Under South Carolina law, the jury must decide whether M.P. suffered offline harm due to the unreasonably dangerous maximization of Roof's online engagement. It bears repeating M.P. need not prove Meta should have contemplated the particular event which occurred, it need only be a natural and probable consequence of the product's defective condition. *Rife v. Hitachi Const. Machinery Co., Ltd.* 363 S.C. 209, 609 S.E.2d 565 (S.C.App. 2005).

## Conclusion

For all the foregoing reasons, M.P. respectfully prays that this Court reverse the District Court's dismissal of Meta on the pleadings and remand the matter back to the District Court for further proceedings.

François M. Blaudeau (ASB-7722-D32F)
Evan T. Rosemore (ASB-3760-N10B)
SOUTHERN MED LAW
2762 BM Montgomery St, Ste 101
Homewood, AL 35209
D: 205.564.2741
F: 205.649.6386
francois@southernmedlaw.com
evan@southernmedlaw.com

*Attorneys for Appellant*

## Certificate of Compliance

This brief is set using plain 14-point proportional Roman-style typeface, including footnotes, as prescribed by FED. R. APP. P. 32(a)(5)-(6).

This document contains **11,488** countable words, which is less than the 13,000-word type-volume limitation prescribed by Fed R. App. P. 32(a)(7)(B)(i). The Microsoft Word word-count feature was used to compute the word count for this certificate.

_____

François M. Blaudeau