No. 23-1880

_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

_____

M.P., BY AND THROUGH JENNIFER PINCKNEY, AS PARENT, NATURAL GUARDIAN, AND NEXT FRIEND,
*Plaintiff-Appellant,*

v.

META PLATFORMS INC., F/K/A FACEBOOK, INC.; FACEBOOK PAYMENTS INC.; FACEBOOK TECHNOLOGIES LLC; INSTAGRAM, LLC; SICULUS INC.; FACEBOOK HOLDINGS LLC; INTERNET RESEARCH AGENCY LLC, A/K/A MEDIASINTEZ LLC, A/K/A GLAVSET LLC, A/K/A MIXINFO LLC, A/K/A AZIMUT LLC, A/K/A NOVINFO LLC; CONCORD MANAGEMENT AND CONSULTING LLC; CONCORD CATERING; YEVGENIY VIKTOROVICH PRIGOZHIN,
*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the District of South Carolina, Charleston Division
Case No. 2:22-cv-03830-RMG

_____

# RESPONSE BRIEF FOR APPELLEES META PLATFORMS, INC.; FACEBOOK PAYMENTS, INC.; FACEBOOK TECHNOLOGIES, LLC; INSTAGRAM, LLC; SICULUS, INC.; AND FACEBOOK HOLDINGS, LLC

_____

Helgi C. Walker
Jacob T. Spencer
Jessica L. Wagner
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500
hwalker@gibsondunn.com

*Counsel for Appellees Meta
Platforms, Inc., f/k/a Facebook,
Inc.; Facebook Payments, Inc.;
Facebook Technologies, LLC;
Instagram, LLC; Siculus, Inc.;
and Facebook Holdings, LLC*

## DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Defendant-Appellee Meta Platforms, Inc. states that it is a publicly traded corporation that does not have any parent corporation. No publicly held corporation owns 10% or more of Meta Platforms, Inc.'s stock. Defendant-Appellee Facebook Holdings, LLC is a subsidiary of Meta Platforms, Inc. The sole member of Facebook Holdings, LLC is Meta Platforms, Inc. Defendant-Appellee Facebook Payments, Inc. is a wholly-owned subsidiary of Meta Platforms, Inc. Defendant-Appellee Facebook Technologies, LLC is a subsidiary of Meta Platforms, Inc. The sole member of Facebook Technologies, LLC is Meta Platforms, Inc. Defendant-Appellee Instagram, LLC is a subsidiary of Meta Platforms, Inc. The sole member of Instagram, LLC is Meta Platforms, Inc. Defendant-Appellee Siculus, Inc. is a wholly-owned subsidiary of Meta Platforms, Inc. No Appellee is a trade association, and no other publicly held corporation or publicly held entity has a direct financial interest in the outcome of this litigation.

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT...................................................................... i

TABLE OF AUTHORITIES.................................................................... iv

INTRODUCTION ...................................................................................1

STATEMENT OF THE CASE ................................................................5

    A.  Factual Allegations......................................................................5

    B.  Plaintiff's Claims .........................................................................7

    C.  Procedural History .....................................................................10

SUMMARY OF THE ARGUMENT.........................................................12

STANDARD OF REVIEW ......................................................................15

ARGUMENT ............................................................................................15

I.     The District Court's Section 230 Holding Should Be Affirmed......15

    A.  Section 230 Bars All of Plaintiff's Claims. ..............................17

    B.  Plaintiff's Arguments Lack Merit............................................21

        1. Section 230 Bars Plaintiff's Products-Liability Claims. .......22

        2. Section 230 Protects Algorithmic Publishing........................27

II.    Plaintiff's Common-Law Claims Independently Fail on State-Law
     Grounds. ....................................................................................35

    A.  Meta Did Not Cause Plaintiff's Injuries...................................36

        1. Meta Was Not the Factual Cause of Roof's Murders............36

        2. Meta Was Not the Proximate Cause of Roof's Murders. ......38

    B.  Facebook Is Not a "Product."....................................................42

C.   The Complaint Does Not Allege that Plaintiff Was a "User or Consumer" of Facebook. ...........................................55

III.   If Plaintiff Had Pleaded a Section 1986 Claim, It Would Fail. ......59

CONCLUSION ...........................................................................66

STATEMENT REGARDING ORAL ARGUMENT .................................67

CERTIFICATE OF COMPLIANCE .......................................................68

# TABLE OF AUTHORITIES

Page(s)

## Cases

*A Soc'y Without a Name v. Virginia*,
655 F.3d 342 (4th Cir. 2011) ...............................................65

*A.M. v. Omegle.com LLC*,
2023 WL 1470269 (D. Or. Feb. 2, 2023) ...........................54

*A.M. v. Omegle.com, LLC*,
614 F. Supp. 3d 814 (D. Or. 2022)...............................25, 53

*Anderson v. N.Y. Tel. Co.*,
320 N.E.2d 647 (N.Y. 1974)...............................................48

*Anderson v. Owens-Corning Fiberglas Corp.*,
53 Cal. 3d 987 (1991)...........................................................47

*Anderson v. TikTok, Inc.*,
637 F. Supp. 3d 276 (E.D. Pa. 2022)...................................26

*Andrus v. Glover Constr. Co.*,
446 U.S. 608 (1980)...............................................................23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................15

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ............................................23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...............................................................45

*Bieros v. Nicola*,
839 F. Supp. 332 (E.D. Pa. 1993)........................................66

*Bishop v. S.C. Dep't of Mental Health*,
502 S.E.2d 78 (S.C. 1998)..............................................38, 39

*In re Blackbaud, Inc., Customer Data Breach Litig.*,
567 F. Supp. 3d 667 (D.S.C. 2021) ........................................59

*Blassingame v. Trump*,
87 F.4th 1 (D.C. Cir. 2023) ................................................61

*Booth v. United States*,
914 F.3d 1199 (9th Cir. 2019) ............................................65

*Bragg v. Hi-Ranger, Inc.*,
462 S.E.2d 321 (S.C. Ct. App. 1995) .............................43, 56

*Bray v. Marathon Corp.*,
588 S.E.2d 93 (S.C. 2003) ...............................36, 38, 56, 57

*In re Breast Implant Prod. Liab. Litig.*,
503 S.E.2d 445 (S.C. 1998) .........................45, 48, 50, 55

*Bride v. Snap Inc.*,
2023 WL 2016927 (C.D. Cal. Jan. 10, 2023).......................26

*Brooks v. Medtronic, Inc.*,
750 F.2d 1227 (4th Cir. 1984) ............................................56

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) ..............................................43

*Clark v. Clabaugh*,
20 F.3d 1290 (3d Cir. 1994) ...............................................62

*Commissioners of Public Works of City of Charleston v.
Costco Wholesale Corp.*,
2021 WL 5908758 (D.S.C. Dec. 13, 2021) ......................57, 58

*Cox v. Twitter, Inc.*,
2019 WL 2513963 (D.S.C. Feb. 8, 2019) .............................21

*Crolley v. Hutchins*,
387 S.E.2d 716 (S.C. Ct. App. 1989) ..................................39

*Desper v. Clarke*,
    1 F.4th 236 (4th Cir. 2021) .................................................................42

*Doe ex rel. L.W. v. Snap Inc.*,
    2023 WL 3830365 (S.D. Cal. June 5, 2023) ........................................26

*Doe v. MySpace, Inc.*,
    528 F.3d 413 (5th Cir. 2008) ................................................20, 22, 27

*Doe v. Twitter, Inc.*,
    555 F. Supp. 3d 889 (N.D. Cal. 2021) ................................................25

*Doe v. Twitter, Inc.*,
    2023 WL 3220912 (9th Cir. May 3, 2023) ..........................................26

*Est. of B.H. v. Netflix, Inc.*,
    2022 WL 551701 (N.D. Cal. Jan. 12, 2022) .......................................45

*In re Facebook, Inc.*,
    625 S.W.3d 80 (Tex. 2021) ................................................................47

*Fields v. J. Haynes Waters Builders, Inc.*,
    658 S.E.2d 80 (S.C. 2008) .......................................................43, 44, 50

*Force v. Facebook, Inc.*,
    934 F.3d 53 (2d Cir. 2019) ..................................................17, 19, 30, 31

*In re GNC Corp.*,
    789 F.3d 505 (4th Cir. 2015) ...............................................................6

*Grayson O Co. v. Agadir Int'l LLC*,
    856 F.3d 307 (4th Cir. 2017) .............................................................19

*Hardin v. PDX, Inc.*,
    227 Cal. App. 4th 159 (2014) ............................................................51

*Henderson v. Source for Pub. Data, L.P.*,
    53 F.4th 110 (4th Cir. 2022) ...................2, 17, 19, 20, 22, 30, 32, 33, 34

*Hensley v. Heavrin*,
    282 S.E.2d 854 (S.C. 1981) ...............................................................39

*Herrick v. Grindr LLC*,
  765 F. App'x 586 (2d Cir. 2019)...........................................23

*Hubbard v. Taylor*,
  529 S.E.2d 549 (S.C. Ct. App. 2000) ....................................39

*Intellect Art Multimedia, Inc. v. Milewski*,
  2009 WL 2915273 (N.Y. Sup. Ct. Sept. 11, 2009) ...............47

*Jackson v. Airbnb, Inc.*,
  2022 WL 16753197 (C.D. Cal. Nov. 4, 2022) ......................26

*Jackson v. Airbnb, Inc.*,
  639 F. Supp. 3d 994 (C.D. Cal. 2022)...................................51

*Jacobs v. Meta Platforms, Inc.*,
  2023 WL 2655586 (Cal. Super. Ct. Mar. 10, 2023) ...............46, 51, 55

*James v. Meow Media, Inc.*,
  300 F.3d 683 (6th Cir. 2002) ................................................47

*James v. Meow Media, Inc.*,
  90 F. Supp. 2d 798 (W.D. Ky. 2000).....................................41

*Johns v. Home Depot U.S.A., Inc.*,
  221 F.R.D. 400 (S.D.N.Y. 2004)...........................................66

*Jolly v. Gen. Elec. Co.*,
  869 S.E.2d 819 (S.C. Ct. App. 2021) ....................................36

*Kinard v. Augusta Sash & Door Co.*,
  336 S.E.2d 465 (S.C. 1985)...................................................36

*Klayman v. Zuckerberg*,
  753 F.3d 1354 (D.C. Cir. 2014).............................................17

*Laurens Elec. Coop., Inc. v. Altec Indus., Inc.*,
  889 F.2d 1323 (4th Cir. 1989) .........................................44, 45

*Lawing v. Univar, USA, Inc.*,
  781 S.E.2d 548 (S.C. 2015)..............................................56, 57

*Lemmon v. Snap, Inc.*,
  995 F.3d 1085 (9th Cir. 2021) .................................................24, 25, 51

*Little v. Brown & Williamson Tobacco Corp.*,
  243 F. Supp. 2d 480 (D.S.C. 2001) .......................................................37

*Marshall v. Lowe's Home Ctrs., LLC*,
  2016 WL 4208090 (D.S.C. Aug. 10, 2016) ....................................43, 56

*Marshall's Locksmith Serv. Inc. v. Google, LLC*,
  925 F.3d 1263 (D.C. Cir. 2019).............................................................31

*Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*,
  576 F.3d 172 (4th Cir. 2009) ..................................................................8

*Nat'l Coal. on Black Civic Participation v. Wohl*,
  2021 WL 4254802 (S.D.N.Y. Sept. 17, 2021)......................................25

*Neitzke v. Williams*,
  490 U.S. 319 (1989)................................................................................15

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
  591 F.3d 250 (4th Cir. 2009) ....................................................16, 18, 30

*O'Kroley v. Fastcase, Inc.*,
  831 F.3d 352 (6th Cir. 2016) ..........................................................21, 31

*Obado v. Magedson*,
  612 F. App'x 90 (3d Cir. 2015)..............................................................31

*Oliver v. S.C. Dep't of Highways & Pub. Transp.*,
  422 S.E.2d 128 (S.C. 1992)............................................................37, 40

*Ostrzenski v. Seigel*,
  177 F.3d 245 (4th Cir. 1999) ........................................................15, 60

*Oulla v. Velazques*,
  831 S.E.2d 450 (S.C. Ct. App. 2019) .............................................58, 59

*Pace v. DiGuglielmo*,
  544 U.S. 408 (2005)................................................................................66

*Pierson v. Sharp Mem'l Hosp., Inc.*,
    264 Cal. Rptr. 673 (Cal. Ct. App. 1989)..................................46, 47, 49

*Prager Univ. v. Google LLC*,
    85 Cal. App. 5th 1022 (2022)................................................................31

*Priest v. Brown*,
    396 S.E.2d 638 (S.C. Ct. App. 1990) .....................................................50

*R. Ernest Cohn, D.C., D.A.B.C.O. v. Bond*,
    953 F.2d 154 (4th Cir. 1991) ................................................................42

*Raplee v. United States*,
    842 F.3d 328 (4th Cir. 2016) ................................................................66

*Rife v. Hitachi Constr. Mach. Co.*,
    609 S.E.2d 565 (S.C. Ct. App. 2005) .....................................................58

*Rodgers v. Christie*,
    795 F. App'x 878 (3d Cir. 2020)............................................................53

*Roe ex rel. Doe v. Snap, Inc.*,
    2022 WL 2528615 (S.D. Tex. July 7, 2022) .........................................26

*Roe ex rel. Doe v. Snap, Inc.*,
    2023 WL 4174061 (5th Cir. June 26, 2023)..........................................26

*S. Cent. Bell Tel. Co. v. Barthelemy*,
    94-0499 (La. 10/17/94), 643 So. 2d 1240 ..............................................54

*S.C. Ins. Co. v. James C. Greene & Co.*,
    348 S.E.2d 617 (S.C. Ct. App. 1986) .....................................................37

*S.C. State Ports Auth. v. Booz-Allen & Hamilton, Inc.*,
    346 S.E.2d 324 (S.C. 1986) ...................................................................58

*Sanders v. Acclaim Ent., Inc.*,
    188 F. Supp. 2d 1264 (D. Colo. 2002)...................................................41

*Schafer v. State Farm Fire & Cas. Co.*,
    507 F. Supp. 2d 587 (E.D. La. 2007).....................................................54

*Simulados Software, Ltd. v. Photon Infotech Private, Ltd.*,
  40 F. Supp. 3d 1191 (N.D. Cal. 2014) ..................................................51

*Smith v. Trump*,
  2023 WL 417952 (D.D.C. Jan. 26, 2023) ...........................................61

*Smith v. Trump*,
  2023 WL 9016458 (D.C. Cir. Dec. 29, 2023).......................................61

*In re Social Media Adolescent Addiction/Pers. Inj. Prods.*
  *Liab. Litig.*,--- F. Supp. 3d ---, 2023 WL 7524912 (N.D.
  Cal. Nov. 14, 2023)..........................................................26, 47, 52, 53

*Stone v. Bethea*,
  161 S.E.2d 171 (S.C. 1968) ..................................................................40

*Strickland v. United States*,
  32 F.4th 311 (4th Cir. 2022).................................................15, 35, 60

*Thompson v. Trump*,
  590 F. Supp. 3d 46 (D.D.C. 2022)........................................................61

*Twitter, Inc. v. Taamneh*,
  143 S. Ct. 1206 (2023).........................................................................28

*United States v. Hasson*,
  26 F.4th 610 (4th Cir. 2022)................................................................59

*Vitol, S.A. v. Primerose Shipping Co.*,
  708 F.3d 527 (4th Cir. 2013) ..............................................................15

*Vogel v. Linde*,
  23 F.3d 78 (4th Cir. 1994) ............................................................65, 66

*Washington v. Union Carbide Corp.*,
  870 F.2d 957 (4th Cir. 1989) ..............................................................42

*Way v. Boy Scouts of Am.*,
  856 S.W.2d 230 (Tex. App. 1993) .......................................................49

*Webber v. Armslist LLC*,
 70 F.4th 945 (7th Cir. 2023)..............................................25

*Westlake Legal Grp. v. Yelp, Inc.*,
 599 F. App'x 481 (4th Cir. 2015)...............................28, 30, 31

*Winter v. G.P. Putnam's Sons*,
 938 F.2d 1033 (9th Cir. 1991) ........................44, 45, 49, 52

*Zeran v. Am. Online, Inc.*,
 129 F.3d 327 (4th Cir. 1997) .................1, 11, 15, 16, 21, 22, 27, 29, 35

*Ziencik v. Snap, Inc.*,
 2023 WL 2638314 (C.D. Cal. Feb. 3, 2023)....................................47, 51

## Statutes

42 U.S.C. § 1985 ................................................3, 7, 11, 59, 60

42 U.S.C. § 1986 .........................................3, 4, 14, 60, 64, 65

47 U.S.C. § 230 ..................................1, 4, 12, 16, 17, 22, 23, 28

S.C. Code Ann. § 15–73–10(1)...................................................55

## Treatises

Restatement (Second) of Torts § 402A .......................................44, 56, 57

Restatement (Third) of Torts: Prod. Liab. § 19(a) ............................45, 46

## Other Authorities

Facebook's Civil Rights Audit – Final Report (July 8, 2020),
 https://about.fb.com/wp-content/uploads/2020/07/Civil-
 Rights-Audit-Final-Report.pdf;.............................................8

Matthew P. Bergman, *Assaulting the Citadel of Section 230
 Immunity: Products Liability, Social Media, and the
 Youth Mental Health Crisis*, 26 Lewis & Clark L. Rev.
 1159 (2023) ...........................................................54

Report of the Senate Select Committee on Intelligence,
  Russian Active Measures Campaigns and Interference in
  the 2016 U.S. Election, Vol. 2: Russia's Use of Social
  Media with Additional Views (Nov. 2020)............................................8

# INTRODUCTION

In June 2015, Dylann Roof shot and killed nine people, including Plaintiff-Appellant M.P.'s father, the Reverend Clementa Pinckney, at the Mother Emanuel AME Church in Charleston, South Carolina. Plaintiff seeks to hold Meta Platforms, Inc. and five of its subsidiaries—along with unrelated Russian Defendants not part of this appeal—liable for Roof's heinous acts. Plaintiff alleges that Meta is liable because it promoted, displayed, or failed to take down (unidentified) extremist content—content that violated its clear standards prohibiting hate speech, harassment, or attempts to incite violence of any kind.

Relying on circuit precedent, the district court correctly concluded that Section 230 of the Communications Decency Act, 47 U.S.C. § 230, bars Plaintiff's claims and properly dismissed the complaint as to Meta. *See Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). In response to the dismissal, Plaintiff lodged this appeal.

The district court's ruling was correct. The only connection alleged between Meta and Roof's crimes is that "racially based hate"—*i.e.*, content—posted by third parties on Facebook in direct violation of Facebook's policies somehow "affirm[ed]" Roof's hateful "beliefs." JA061-

1

062 (¶ 167). Plaintiff's claims are all premised on this theory and thus improperly seek to hold Meta liable as the "'publisher or speaker' of [such] information" in violation of Section 230 and this Court's precedent. *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 120 (4th Cir. 2022). There is no basis to deviate from the district court's faithful application of that precedent.

Should the Court proceed beyond Section 230, it may also affirm the dismissal on one of any number of alternative grounds.

The complaint's state-law products-liability claims fail for three independent reasons. *First*, the complaint does not allege plausibly that Meta was the factual or legal cause of Plaintiff's injuries. According to the complaint, "Roof was radicalized online," JA007 (¶ 5), but the complaint concedes that Roof "did not spend that much time on Facebook" and acknowledges that Roof found white supremacist content on *other* websites—*not* on Facebook, JA061-062 (¶ 167). It does not allege that he saw any particular radical posts on Facebook. In any event, Roof's own actions are a paradigmatic superseding cause breaking any causal chain.

*Second*, although all of the state-law claims are pleaded as products-liability claims, Facebook is not a "product" as a matter of law.

In South Carolina, it is well established that there can be no strict-products-liability claim with respect to services, as opposed to tangible products. And other courts around the country have confirmed that intangible communications services such as Facebook cannot be sued under products-liability theories.

*Third*, only the ultimate user or consumer who is injured by a product can bring a products-liability claim. And Plaintiff does not allege that she has ever used Facebook, or that she was injured in her capacity as a Facebook user.

Finally, any claim under 42 U.S.C. § 1986—which Plaintiff raises on appeal but did not specifically plead in the complaint—independently fails. Instead of Section 1986, Plaintiff's complaint pleaded a claim under 42 U.S.C. § 1985 alleging that Meta and the Russian Defendants conspired to violate civil rights. The district court dismissed this Section 1985 claim because it found any such conspiracy implausible, given the lack of factual detail in the allegations. Plaintiff does not challenge that dismissal on appeal; instead, she argues that Meta failed to stop a conspiracy among the Russians to sow racial discord online in violation of Section 1986. But the complaint does not plausibly allege that Meta

had the power to stop the Russian Defendants from carrying out such a conspiracy, or that Meta knew about the purported conspiracy, let alone in time to stop Roof from carrying out his horrific crimes. Regardless, any Section 1986 claim is untimely under that provision's one-year statute of limitations.

This Court should affirm the district court's dismissal with prejudice.

## STATEMENT OF THE ISSUES

1. Whether Plaintiff's claims against Meta, which seek to impose liability on Meta as the publisher of third-party content, are barred by 47 U.S.C. § 230 and binding circuit precedent.

2. Whether the district court's dismissal of Plaintiff's state-law claims against Meta should be affirmed for failure to state a claim on multiple alternative grounds.

3. Whether the district court correctly dismissed any claim against Meta under 42 U.S.C. § 1986, which was not pleaded and would fail on multiple alternative grounds.

## STATEMENT OF THE CASE

### A.    Factual Allegations

On June 17, 2015, Roof entered the Mother Emanuel AME Church with the intent to murder its congregants.  JA006 (¶ 1).  After joining a Bible study, Roof shot and killed the Reverend Clementa Pinckney and eight other parishioners.    JA006 (¶ 2).    Plaintiff M.P. is Reverend Pinckney's daughter, and she was present when Roof murdered her father.  JA006, JA062 (¶¶ 1-2, 169).

The complaint describes Roof as "a classic lone wolf"—characterized by "toug[h] to predict" behavior and "unrestrained violence"—who "radicalized" online.  JA023-024 (¶ 56).  In his own telling, Roof was motivated by white supremacist beliefs he encountered on websites— other than Facebook—following the 2012 death of Trayvon Martin. JA024-025 (¶ 60).  According to the complaint, Roof "began the radicalization process [by] performing a Google search for 'black on white crime' which took him to the website of a South Carolina-based hate

group named the Council of Conservative Citizens (formerly the White Citizens' Council)." JA061 (¶ 166).[1]

With respect to Facebook, the complaint alleges that Facebook "facilitate[s] … ways" in which "billions of users" "seek and share information, engage in debate, and participate in society." JA010-011 (¶ 14). To sort the vast quantity of content those users create, Facebook uses "algorithmic systems" to "process … data" about the content and each user's interests, and then "tailor[s] each user's online experience" so that the site is accessible and useful. JA010-011 (¶ 14). As the complaint recognizes, algorithms thus reflect Meta's editorial judgments coded into the architecture of Facebook. *See* JA038 (¶ 101). Similar algorithms are used by countless websites to provide easy-to-use online services. JA037 (¶ 97).

The complaint alleges that Roof "had a Facebook page," JA010 (¶ 13), and asserts that he "joined extremist groups on Facebook," without specifying what these groups were, JA024-025 (¶ 60). It

---

[1] Because this appeal follows from a motion to dismiss, the facts are described as they are alleged in the complaint. *In re GNC Corp.*, 789 F.3d 505, 509 (4th Cir. 2015).

acknowledges that Roof "did not spend that much time on Facebook and was not particularly active with posting." JA061-062 (¶ 167). The complaint alleges that Roof changed his "profile photo" three weeks prior to the shooting. JA010 (¶ 13).

But the complaint does not describe a single racist, hateful, or extremist post, video, comment, or group that Roof ever purportedly viewed or joined on Facebook. And the complaint does not allege that Roof ever discussed Facebook in any of his racist "manifestos," despite detailing other sites that purportedly contributed to his radicalization. *See* JA024-025, JA061 (¶¶ 60, 166) (citing Roof's manifesto).

### B.    Plaintiff's Claims

The complaint seeks to hold Meta liable for Plaintiff's injuries, as well as a broader campaign of "race-based hate"—*i.e.*, content. JA022 (¶ 51). The complaint advances three products-liability claims for strict products liability, JA063-065 (¶¶ 170-186), negligent design defect, JA065-066 (¶¶ 187-193), and negligent infliction of emotional distress via a product, JA066-067 (¶¶ 194-203), and one claim for conspiracy to violate the civil rights of African Americans under 42 U.S.C. § 1985(3), JA067-070 (¶¶ 204-216).

The central theory of the complaint is that Facebook is designed to "maximize user engagement, promoting and encouraging time spent on the platform." JA009-010 (¶ 12). According to the complaint, because "provocative content"—*i.e.*, content that is "inflammatory," "negative," or "divisive"—is the most "engaging," Facebook's algorithms "promot[e]" that material—*i.e.*, display it more prominently in users' News Feeds. JA009-012, JA030-031, JA039 (¶¶ 12, 17, 80, 103). The complaint alleges that "repeated exposure to [such] inflammatory [content] result[s] in emotional desensitization," while "extended" exposure to "extremist content" leads to "radicalization." JA021-022 (¶ 48).

The complaint acknowledges that Meta does not "have any animus toward people of color." JA031 (¶ 81). Meta's "Community Standards," which the complaint references, JA025, JA031-032 (¶¶ 63, 82), "prohibit hate speech, harassment, and attempts to incite violence through the platform." [2] Nonetheless, the complaint alleges that, due to its

---

[2] Facebook's Civil Rights Audit – Final Report 42 (July 8, 2020), https://about.fb.com/wp-content/uploads/2020/07/Civil-Rights-Audit-Final-Report.pdf; *see Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 176 (4th Cir. 2009) ("In reviewing [a] district court's dismissal under Rule 12(b)(6)," the Court considers "'documents incorporated into the complaint by reference.'").

"engagement"-based algorithmic sorting, "Facebook directly enabled and allowed white supremacy groups and foreign governments to target Americans with messages and video content meant to sow racial discord." JA025-026 (¶ 64).

Plaintiff further alleges that the Russian government, acting through four named defendants (collectively, the "Russian Defendants"), "clandestine[ly]" used Facebook as a "tool" to "exploit racial divisions in the United States." JA053-055, JA068 (¶¶ 138, 143, 209). Nonetheless, as a Senate report referenced in the complaint explains, Meta on its own "uncovered" and reported the Russian Internet Research Agency, a Russian group, "precipitat[ing] audits" at other social media companies. Report of the Senate Select Committee on Intelligence, Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Vol. 2: Russia's Use of Social Media with Additional Views 76-77 (Nov. 2020); *see* JA018 (¶ 37 n.1) (citing the Report). And the complaint further acknowledges that Meta took steps to identify and report "Russian expenditures on their platforms," removing accounts and disrupting networks. JA056-057 (¶ 149).

But the complaint nonetheless asserts that Meta "participated in [a] conspiracy" with the Russian Defendants to "interfer[e] with the right of African Americans to vote" and otherwise deprive them of their civil rights by "[d]esigning" Facebook to "maximize user engagement" and "allowing fictitious social media accounts to stoke racial tensions." JA068-069 (¶¶ 207, 210). As a result, the complaint alleges that "[b]oth the Russian Defendants and the Meta Defendants bear civil liability for the online radicalization of Dylann Roof." JA013 (¶ 19).

## C.   Procedural History

The district court (Judge Gergel) dismissed all claims against Meta. The court first held that all of Plaintiff's state-law claims are barred by Section 230. The court reasoned that "a quarter of a century of case law since the adoption of Section 230 in 1996" has rejected "highly analogous claims by victims of terrorist violence and other wrongful conduct inflicted by actors who accessed and consumed hate material on social media sites." JA091. It is thus established that "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional functions—such as deciding whether to publish, withdraw[,] postpone, or

alter content—are barred" by Section 230.  JA091 (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)).

The court rejected Plaintiff's effort "to plead around" these principles by "asserting product liability claims based on the theory that the algorithms and internal architecture of social media sites" are flawed. JA092.  No matter how such claims are pleaded, the court explained, they at bottom seek "to hold internet service providers liable for the content produced by third parties"—precisely what Section 230 forbids.  JA093.

The court separately rejected Plaintiff's civil-rights conspiracy claim under 42 U.S.C. § 1985(3) because the complaint is "bereft of any details of such an alleged conspiracy, including which specific individuals conspired, how they communicated, the details of any meetings, and the substance, purpose, or scope of the alleged conspiracy."  JA095.

Plaintiff appealed the district court's dismissal on August 21, 2023. JA083-084.  This Court briefly remanded the case for the district court to resolve Plaintiff's pending motion to clarify that only her claims against Meta—and not the Russian Defendants—had been dismissed.  The district court issued an amended order and opinion so clarifying, and

then, on joint motion of the parties, the court entered partial final judgment on October 12, 2023. JA099.

## SUMMARY OF THE ARGUMENT

**I.** All of Plaintiff's claims are barred by Section 230 of the Communications Decency Act. Section 230 shields from liability any interactive computer service provider that a plaintiff seeks to hold liable as the publisher of third-party content. The text of the statute provides that "[*n*]*o* cause of action may be brought" that treats a provider as a "publisher" of such content. 47 U.S.C. § 230(c)(1), (e)(3) (emphasis added).

Here, although Plaintiff cloaks her claims in the guise of defective-design and civil-rights violations, at their core, they all seek to hold Meta liable on a theory that Facebook published allegedly harmful content to Dylann Roof. Courts, including this Court, have repeatedly held that Section 230 protects algorithmically enabled editorial decisions—technology that Congress sought to foster by enacting Section 230.

**II.** The Court may alternatively affirm the district court's decision as to the products-liability claims on the ground that they fail under state law.

**A.** Each of Plaintiff's claims fails because the complaint does not plausibly allege causation. The complaint does not allege that Meta's purported actions were a substantial factual cause of Roof's murders (and, thereby, Plaintiff's injuries). The complaint alleges that Roof became radicalized from a Google search that led him to the Council of Conservative Citizens' website—*not* Facebook. *See* JA061-062 (¶¶ 166-167). The only non-conclusory allegation that discusses Roof's Facebook interactions is that Roof changed his own profile picture on the site a few weeks before he committed murder, JA010 (¶ 13); the complaint does not identify a *single* post that Roof saw or *any* group that he joined on Facebook.

In addition, the complaint fails to allege that Meta's purported actions were a proximate cause of Roof's actions. The complaint does not plausibly allege that Meta could have foreseen that Roof—who, according to the complaint, spent little time on Facebook and acted because no one else "was really doing anything but talking," JA024-025, JA061-062 (¶¶ 60, 167)—would commit his barbaric crimes.

**B.** Plaintiff's state-law claims also fail because Facebook is not a "product" as a matter of law. In South Carolina (and elsewhere), it is well

established that products liability cannot lie with respect to "services," as opposed to "products." Facebook is an intangible communications service, not a tangible product, as courts around the country have confirmed.

**C.** Plaintiff's state-law claims fail because under South Carolina law, only the ultimate user or consumer of a product can sustain a claim for products liability. Plaintiff does not allege that she has ever used Facebook or that she was injured in her capacity as a Facebook user.

**III.** Any Section 1986 claim (which the complaint did not specifically plead) fails for at least three reasons. *First*, as explained above, Section 230 bars such a claim because Plaintiff's theory is that Meta is liable for failing to prevent the Russian Defendants from posting on Facebook. *Second*, the complaint fails to allege that Meta had the "power" to prevent the Russian Defendants or Roof from acting—or even that Meta had actual knowledge of a conspiracy between the Russian Defendants, or that Meta had such knowledge before Roof committed his horrific murders. *Third*, any such claim is barred by Section 1986's one-year statute of limitations. Plaintiff's claims accrued, at the latest, in April 2019; yet she did not file the complaint until November 2022. Neither minority tolling nor equitable tolling is available.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's decision to dismiss a complaint for failure to state a claim. *Strickland v. United States*, 32 F.4th 311, 347 (4th Cir. 2022). The Court "may affirm" the district court's dismissal on "any ground supported by the record even if it is not the basis relied upon by the district court." *Ostrzenski v. Seigel*, 177 F.3d 245, 253 (4th Cir. 1999).

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Conclusory statements and bare assertions do not suffice. *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 543 (4th Cir. 2013). Claims may be dismissed on a dispositive legal issue. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

## ARGUMENT

## I. The District Court's Section 230 Holding Should Be Affirmed.

Congress enacted Section 230 to address the "specter of tort liability" on the internet and its "obvious chilling effect." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997). Section 230 proclaims that "[n]o provider or user of an interactive computer service shall be treated as the

publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).

Congress expressly preempted state laws that conflict with that provision, as "[n]o cause of action may be brought and no liability may be imposed" under any state law "inconsistent with" Section 230.  47 U.S.C. § 230(e)(3).  While Section 230 carves out certain claims under federal law from its reach, it contains no exception for civil claims under Section 1986.  *See id.* § 230(e)(1)-(2), (4)-(5).

Read together, these provisions bar lawsuits under state or non-exempted federal law "seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content."  *Zeran*, 129 F.3d at 330.  Section 230 thus establishes a "broad immunity" to "any cause of action that would make service providers liable for information originating with a third-party user of the service."  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 n.4, 258 (4th Cir. 2009).

Because all of Plaintiff's claims seek to impose liability on Meta as the publisher of third-party content, Section 230 bars her claims.

### A. Section 230 Bars All of Plaintiff's Claims.

This Court has adopted a three-part test to determine whether Section 230 applies. The statute mandates dismissal when (1) the defendant is a "provider … of an interactive computer service"; (2) the allegedly harmful content was "provided by another information content provider"; and (3) the claim seeks to hold "the defendant responsible 'as the publisher or speaker'" of that content. *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 119 (4th Cir. 2022) (quoting 47 U.S.C. § 230(c)(1)).

**1.** There is no question that Meta is a "provider" of "an interactive computer service"—here, Facebook. *Force v. Facebook, Inc.*, 934 F.3d 53, 64 (2d Cir. 2019); *see also Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014). And each of the other elements is satisfied as well.

**2.** The second element of Section 230 asks whether the allegedly harmful content was "provided by another information content provider," which is a person or entity "responsible, in whole or in part, for the creation or development" of content. 47 U.S.C. § 230(c)(1), (f)(3). As this Court has explained, "Congress … established a general rule that

providers of interactive computer services are liable only for speech that is properly attributable to them." *Nemet*, 591 F.3d at 254.

Here, the complaint's claims turn on content provided by third-party users, not Meta. The complaint alleges that "Roof radicalized online." JA025 (¶ 62). Although the complaint acknowledges that "Roof did not spend that much time on Facebook," it alleges that the limited "time [Roof] spent on Facebook served as an affirmation of beliefs and thoughts that first entered Roof's mind via a Google search." JA061-062 (¶ 167). And it asserts vaguely that "racially based hate on Facebook, which was accelerated by the Russian defendant's social media campaign," JA061-062 (¶ 167), was "a factor" in Roof's online radicalization, JA025 (¶ 62).

On appeal, Plaintiff does not dispute that whatever (unidentified) content Roof allegedly might have seen on Facebook was provided by third parties, not Meta. Nor could she. The complaint alleges that Facebook enabled third-party groups and foreign governments to share "messages and video content," JA025-026 (¶ 64), and permitted other "users" to post "inflammatory and divisive content," JA034 (¶ 88). But Plaintiff does not allege that Meta *created* any of that content. And she

has forfeited any argument to the contrary on appeal. *See Grayson O Co. v. Agadir Int'l LLC,* 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief").

Plaintiff's complaint seemingly suggests that Facebook's use of algorithmic publishing "contributed to the development and creation" of allegedly harmful content. JA063 (¶ 174). But she expressly disclaims any such argument here. *See* Op.Br.24-25 ("M.P. does not 'frame' [Facebook's algorithms] as 'content'"); *id.* at 13 ("third-party content [and] publication thereof … did play a role in the harm"). Rightly so: "Merely arranging and displaying others' content to users of Facebook through [the use of] algorithms … is not enough to hold Facebook responsible as the 'develop[er]' or 'creat[or]' of that content." *Force*, 934 F.3d at 70 (brackets in original). Facebook thus does not "'materially' contribut[e]" to the content. *Henderson*, 53 F.4th at 127 (quoting *Force*, 934 F.3d at 68) (adopting this test).

**3.** Plaintiff's appeal focuses on the third element of Section 230: whether the complaint impermissibly seeks to hold Meta liable as the "publisher" of allegedly harmful third-party content within the meaning of Section 230, because all of Plaintiff's claims involve Meta's "exercise of

a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Henderson*, 53 F.4th at 127; *see also Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th Cir. 2008) ("decisions relating to the monitoring, screening, and deletion of content from its network—actions quintessentially related to a publisher's role"—are immune (citation omitted)). As the district court correctly concluded, the complaint easily satisfies this element.

At its core, the complaint faults Meta for the third-party content it published and the way it allegedly displayed that content to users such as Roof. JA034 (¶ 89). For example, the complaint alleges that Meta's algorithms promote content that will "maximize [user] engagement" and that "provocative content helps to accomplish this goal." JA009-010, JA030, JA039 (¶¶ 12, 78, 104). It faults Meta for "reject[ing]" "options for moderating its algorithms' tendency to promote hate speech and misinformation." JA048 (¶ 126). And it blames Meta for not preventing Roof from "consum[ing] evil propaganda" and other "toxic content." JA023, JA030-031 (¶¶ 55, 80).

As Plaintiff summarizes her state-law claims on appeal, she faults Meta because Facebook supposedly "directed" certain harmful content to

Roof. Op.Br.4, 8. And to the extent the complaint pleads any Section 1986 claim, that claim is based entirely on Facebook's alleged provision of accounts to and failure to remove content generated by the Russian Defendants. *See, e.g.*, JA068-069 (¶ 210).

But decisions about whether and how to display, alter, promote, monitor, or delete content are all "traditional editorial functions" protected by Section 230. *Zeran*, 129 F.3d at 330; *see also O'Kroley v. Fastcase, Inc.*, 831 F.3d 352, 355 (6th Cir. 2016) (Section 230 barred claim for failure to remove search results); *Cox v. Twitter, Inc.*, 2019 WL 2513963, at *3 (D.S.C. Feb. 8, 2019) ("[T]he decision to furnish an account, or prohibit a particular user from obtaining an account, is itself publishing activity").

In sum, because each of Section 230's requirements is satisfied for all of Plaintiff's claims, the district court correctly held that Section 230 bars her claims. This Court should affirm.

## B. Plaintiff's Arguments Lack Merit.

Plaintiff contends that Section 230 does not apply to her claims because they supposedly rest on "Meta's own product design decisions," such as its use of algorithms. Op.Br.12, 23. But courts have consistently

rejected similar efforts to evade Section 230 by framing claims as products-liability claims, just as they have consistently held that Section 230 protects algorithmic publishing.

### 1. Section 230 Bars Plaintiff's Products-Liability Claims.

Plaintiff insists (at 30) that Section 230 does not bar her products-liability claims because Meta "would only have to alter the design of *its own product* to reduce the unreasonable risk" of what Plaintiff calls "'emotional contagion.'" But Section 230 speaks in categorical terms, and it protects websites from all claims, however creatively styled, that "trea[t]" websites as the "publisher or speaker of" third-party content. 47 U.S.C. § 230(c)(1); *see Zeran*, 129 F.3d at 330 (Section 230 applies to "*any* cause of action" (emphasis added)); *MySpace*, 528 F.3d at 420 (applying Section 230 to claims that MySpace "fail[ed] to implement basic safety measures to protect minors").

As this Court has explained, "when considering whether any claim treats [a defendant] as a publisher, our precedent teaches that we must look beyond the claim's formal elements." *Henderson*, 53 F.4th at 124. "[W]hat matters" is not how a claim is labeled but "whether the cause of action inherently requires the court to treat the defendant as the

'publisher or speaker' of content provided by another." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101-03 (9th Cir. 2009). Thus, Plaintiff cannot evade Section 230 by characterizing her challenges to Meta's publishing activity as "products-liability" claims. As the Second Circuit has held, where an alleged products-liability claim is "inextricably linked" to an "alleged failure to edit, monitor, or remove … offensive content," Section 230 bars the claim. *Herrick v. Grindr LLC*, 765 F. App'x 586, 591 (2d Cir. 2019).

Statutory text confirms that Section 230 applies to products-liability claims. Congress specifically excluded several categories of claims from Section 230's broad immunity. For example, Section 230 does not apply to any "Federal criminal statute," 47 U.S.C. § 230(e)(1); it does not "limit or expand any law pertaining to intellectual property," *id.* § 230(e)(2); and it exempts certain criminal and civil sex-trafficking laws, *id.* § 230(e)(5). But Congress did *not* exempt products-liability claims or any similar torts. And Congress's broad preemption language, coupled with its failure to exclude common-law torts, makes clear that it intended Section 230(c) to apply to such claims. *See Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980) ("Where Congress explicitly enumerates

certain exceptions to a general prohibition, additional exceptions are not to be implied").

None of Plaintiff's cases supports concocting an atextual exception for products-liability claims. In *Erie Insurance Co. v. Amazon.com, Inc.*, for example, the plaintiffs alleged that the defendants sold *tangible* goods that caused *physical* injury or property damage. 925 F.3d 135, 137 (4th Cir. 2019). Section 230 did not apply, because the plaintiffs' claims were based on Amazon's "actions as a seller" and "not on … internet content." *Id.* at 139. But this Court explained that Section 230 *would* bar claims, like Plaintiff's, that based liability on "*the content of* [*third-party*] *speech published* by Amazon," such as if Amazon had been "the publisher of a misrepresentation of the product." *Id.* at 139-40.

Plaintiff likewise misapprehends the applicability of *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021). There, the "danger" allegedly posed by Snapchat was a speed filter, which allowed users to track and share their driving speeds, that was created by Snap itself. The products-liability claim in *Lemmon* survived Section 230 (though the court did not address whether it could survive on the merits) because it had "nothing to do" with any third-party content and the alleged duty was "fully

independent" of Snap's role in monitoring or publishing third-party content. *Id.* at 1092-93. But the Ninth Circuit made clear that Section 230 would *not* permit plaintiffs to "fault Snap for publishing other Snapchat-user content … that may have incentivized [users] to engage in dangerous behavior." *Id.* at 1093 n.4. That is precisely what Plaintiffs allege here—that Facebook's algorithms amplified hateful content, which inspired Roof to commit murder.[3]

Courts interpreting *Lemmon* have confirmed that Section 230 bars products-liability claims when, as here, "the nature of the alleged design flaw" and "the harm that is alleged to flow from that flaw" "directly relat[e] to the posting of third-party content." *Doe v. Twitter, Inc.*, 555

---

[3] Plaintiff's reliance on *Webber v. Armslist LLC*, 70 F.4th 945 (7th Cir. 2023), *National Coalition on Black Civic Participation v. Wohl,* 2021 WL 4254802 (S.D.N.Y. Sept. 17, 2021), and *A.M. v. Omegle.com, LLC*, 614 F. Supp. 3d 814 (D. Or. 2022), is similarly misplaced. *Webber* did not even address whether Section 230 barred the claims at issue. *See* 70 F.4th at 957. *Wohl* determined that the defendant materially contributed to the creation of the illegal content, while simultaneously explaining that "the use of neutral algorithms does not constitute content development." 2021 WL 4254802, at *9-10. And in *Omegle.com*, the alleged defect, unlike here, existed irrespective of what content was "exchanged between [two users]." 614 F. Supp. 3d at 821.

F. Supp. 3d 889, 930 (N.D. Cal. 2021), *aff'd in part and rev'd in part on other grounds by* 2023 WL 3220912 (9th Cir. May 3, 2023).[4]

Plaintiff also cites (at 34) Justice Thomas's solo statement respecting the denial of certiorari in *Malwarebytes, Inc. v. Enigma Software Group USA, LLC* for the proposition that Section 230 should not bar *some* "product design" claims that rest on "the defendant's own misconduct."  141 S. Ct. 13, 18 (2020).  Obviously, that statement is not the law.  And even courts that have permitted limited products-liability claims to proceed past the pleadings have held that "Section 230 immunizes" claims that "challenge [an online service's] use of algorithms to determine whether, when, and to whom to publish third-party content." *In re Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, --- F. Supp. 3d ---, 2023 WL 7524912, at *15 (N.D. Cal. Nov. 14, 2023).

---

[4] *See, e.g.*, *Roe ex rel. Doe v. Snap, Inc.*, 2022 WL 2528615, at *14 (S.D. Tex. July 7, 2022) (negligent-design claim barred because a "lack of safety features" was relevant only if the features would have blocked "wrongful communication[s]"), *aff'd*, 2023 WL 4174061 (5th Cir. June 26, 2023) (per curiam); *Anderson v. TikTok, Inc.*, 637 F. Supp. 3d 276, 280-81 (E.D. Pa. 2022) (design defect of publishing "dangerous content" was "'inextricably linked' to the manner in which [TikTok] choose[s] to publish third-party user content"); *Doe ex rel. L.W. v. Snap Inc.*, 2023 WL 3830365, at *5 (S.D. Cal. June 5, 2023) (similar); *Bride v. Snap Inc.*, 2023 WL 2016927, at *5 (C.D. Cal. Jan. 10, 2023) (similar); *Jackson v. Airbnb, Inc.*, 2022 WL 16753197, at *2 (C.D. Cal. Nov. 4, 2022) (similar).

That is this case in a nutshell: Plaintiff's attempt to hold Meta liable for alleged design defects that permit publication of purportedly harmful third-party content is no different than holding Meta liable for transmitting and publishing those communications. *See MySpace*, 528 F.3d at 420. Plaintiff's allegation that Facebook is defective because it causes "emotional contagion," JA041 (¶ 108), only underscores the real nature of her claims. Numerous print publications could be accused of "emotional contagion," but a traditional newspaper does not become subject to a products-liability suit because it places an eye-catching headline or evocative picture on the front page. Such placement or promotional decisions, like Meta's alleged actions here, are core publishing activity. Whatever label Plaintiff attaches to her claims, Section 230 bars them.

### 2. Section 230 Protects Algorithmic Publishing.

As explained, the complaint faults Meta for its alleged decisions about whether and how to display, monitor, or delete content—all "traditional editorial functions" protected by Section 230. *Zeran*, 129 F.3d at 330. The fact that Meta allegedly implemented those decisions through "algorithms" makes no difference: Automated publishing is still

publishing, as Plaintiff tacitly concedes. *See* Op.Br.23 (Facebook's "actual 'publishing' is done by the end product," *i.e.*, the algorithm); *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206, 1226-27 (2023) ("'recommendation' algorithms are merely part of th[e] infrastructure" through which "[a]ll the content on [Facebook] is filtered").

Thus, any argument that Meta does not act as a publisher when it uses algorithms to sort and organize content—*i.e.*, to publish content—is a non-starter. *See Westlake Legal Grp. v. Yelp, Inc.*, 599 F. App'x 481, 485 (4th Cir. 2015) (per curiam) (An "automated system" that filters content is protected by Section 230 because such activity "constitute[s] [a] traditional editorial functio[n]").

**a.** Section 230's text confirms that using automated content sorting is protected by Section 230 immunity. Congress defined an "interactive computer service" to include "access software provider[s]" whose tools "filter," "pick," "choose," "digest," "organize," or "reorganize" content. 47 U.S.C. § 230(f)(2), (4)(A)-(C). It would make no sense to conclude that the *provision* of such "enabling tools" renders a provider eligible for immunity, *id.*, while simultaneously concluding that the *use* of such tools strips a provider of immunity.

28

And, as this Court recognized in *Zeran*, Congress enacted Section 230 to *prevent* the imposition of tort liability because a provider automates its publishing decisions. *See* 129 F.3d at 331, 333. Specifically, Congress enacted Section 230 in part to overturn *Stratton Oakmont, Inc. v. Prodigy Services Co.*, where a website had used an "automatic software screening program" (*i.e.*, an algorithm) to identify, block, and delete posts that violated its content guidelines. 1995 WL 323710, at *2-5 (N.Y. Sup. Ct. May 24, 1995). *Stratton Oakmont* held that the website *should* be treated as a publisher, and thus liable for all third-party content on its website, because the service exercised editorial control by "actively utilizing technology" to moderate content. *Id.* at *4.

*Zeran* explained that Section 230's broad immunity "remove[d] the disincentives to selfregulation created by the *Stratton Oakmont* decision" and thus encouraged online services to "develo[p] and utiliz[e] … [new] blocking and filtering technologies," such as automated filtering and algorithmic sorting tools. 129 F.3d at 331. To accomplish this objective, Congress "forb[ade]" the "imposition of publisher liability on a service provider" for the use of technology to execute "its editorial and self-regulatory functions." *Id.*

**b.** This Court and others around the country have repeatedly endorsed *Zeran*'s reading of Section 230. *See Henderson*, 53 F.4th at 120; *Nemet*, 591 F.3d at 257. Every court of appeals (including this one) to consider the question has held that Section 230 immunity applies when— as here—a plaintiff challenges a service's use of algorithms to filter, sort, or recommend third-party content. *See Westlake Legal Grp.,* 599 F. App'x at 485 ("automated system[s]" that filter content are protected).

For example, in *Force*, the Second Circuit held that Section 230 barred claims alleging that Facebook's algorithms "actively brin[g] Hamas' message to interested parties," thus inspiring them to violence. 934 F.3d at 57, 65. The court concluded that the ordinary meaning of "publisher" defeated the plaintiffs' arguments that "Facebook's use of algorithms renders it a non-publisher." *Id.* at 66 (collecting cases).

The Ninth Circuit reached the same conclusion in *Dyroff v. Ultimate Software Group, Inc.*, holding that Section 230 barred claims based on algorithmic recommendations directing the plaintiff's son, who suffered from drug addiction, to groups about heroin. 934 F.3d 1093, 1098 (9th Cir. 2019). The court explained that "recommendations and notifications" based on "algorithms" that "analyze user posts" are "tools

meant to facilitate the communication and content of others," and they thus fall within the scope of "publish[ing]" under Section 230. *Id.*; *see also Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1271 (D.C. Cir. 2019) (same); *O'Kroley*, 831 F.3d at 355 (same); *Obado v. Magedson*, 612 F. App'x 90, 93 (3d Cir. 2015) (per curiam) (same).

As these courts have recognized, "since the early days of the Internet," services have "always decided … where on their sites (or other digital property) particular third-party content should reside and to whom it should be shown." *Force*, 934 F.3d at 66. And they have explained that the design features that Plaintiff challenges—*i.e.*, algorithmic ranking systems—simply constitute the way that modern-day services such as Facebook and others organize and display voluminous third-party content to help users identify content that is likely of interest to them. *See Westlake Legal Grp.*, 599 F. App'x at 485; *Prager Univ. v. Google LLC*, 85 Cal. App. 5th 1022, 1034 (2022) (allegations concerning "algorithms that direc[t] inflammatory … postings to personalized newsfeeds of other users d[o] not defeat section 230 immunity").

**c.** Plaintiff mistakenly suggests (at 28) that *Henderson* rejected *Force* and (at 17) replaced bedrock Fourth Circuit Section 230 precedent in *Zeran* and *Nemet*. Both contentions are wrong. *Henderson* in fact relied on *Force* and adopted its test for analyzing the third-party content prong of Section 230, which this Court described as "fit[ting] well within our broader § 230(c)(1) jurisprudence." 53 F.4th at 127. *Henderson* likewise explicitly affirmed *Zeran* and *Nemet*. *See id.* at 124 ("*Zeran* itself is instructive."); *id.* at 127 (endorsing *Nemet*'s framework).

*Henderson* concerned Fair Credit Reporting Act ("FCRA") claims brought against Public Data, a company that collected information about individuals, created a "reformat[ted] and alter[ed]" database of that information, and then sold access to that database, which was used to "check creditworthiness" and "perfor[m] background checks for employment purposes." 53 F.4th at 117-18. Drawing on *Zeran*, *Nemet*, and *Erie Insurance*, the Court explained that under Section 230 a claim "treats the defendant 'as the publisher or speaker' … if it (1) bases the defendant's liability on the disseminating of information to third parties and (2) imposes liability based on the information's improper content." *Id.* at 123.

Applying this test, the Court in *Henderson* concluded that certain of plaintiffs' FCRA claims—which alleged that Public Data failed to provide plaintiffs with a copy of their own records, failed to obtain certain required certifications from employers, and failed to provide a summary of consumer rights to employers—did not violate the publisher prong of Section 230. As the Court explained, these claims either did not involve publication of information about plaintiffs to a "third party" (*i.e.*, for allegations that Public Data failed to provide plaintiffs' own information to them) or were "in no way based on the improper content of any information spoken or published by Public Data" (*i.e.*, for allegations that Public Data failed to obtain required certifications from employers or provide notice of consumer rights to them). 53 F.4th at 124-25.

In contrast, the Court suggested that claims seeking "to impose liability" based on Public Data's "failure to maintain proper procedures to ensure accurate information" *could* fall within the ambit of Section 230—at least where the resulting "inaccurate information" was communicated to a third party (though the Court ultimately rejected application of Section 230 to these claims on other grounds). 53 F.4th at 125-26.

Nothing in *Henderson* remotely suggests that products-liability claims resting on algorithmic design are excluded from Section 230. Instead, *Henderson* was clear that a claim that a defendant disseminated harmful, third-party information *would* implicate the defendant's "editorial functions" and would thus be barred by Section 230. 53 F.4th at 123, 127. Plaintiff's claims that Facebook improperly used algorithms to publish third-party content that supposedly incited Roof to violence fall within the "functional" analysis applied by *Henderson*. *Id.* at 124. They both (1) "mak[e] [Meta] liable for publishing certain information" and (2) "see[k] to impose liability based on that information's improper content." *Id.* at 120-21.

\*   \*   \*

In the end, the complaint barely disguises its effort to impose liability for Meta's publishing activity: "Ultimately, the question the jury will have to answer is whether Facebook should be held accountable for creating an algorithm that fed increasingly violent and provocative *content* to its users." JA062 (¶ 168) (emphasis added). Plaintiff admits that courts have long held that "algorithm design decisions" are "immunized 'publishing activity'" because such "design" choices are

"nothing more than automation of the act of publishing." Op.Br.24. Plaintiff also concedes that these "product design decisions" "are connected to Meta's publishing activity in the sense the actual 'publishing' is done by the end product of these decisions." Op.Br.23.

Those concessions are correct—and they decide this case. There is no principled reason to distinguish between manual publishing activities and those same choices coded into algorithms that filter, recommend, and reorganize the multitude of third-party content on Facebook and other internet services. Accordingly, as the district court rightly concluded, Section 230 bars Plaintiff's claims. *See Zeran*, 129 F.3d at 330.

## II. Plaintiff's Common-Law Claims Independently Fail on State-Law Grounds.

Even if Plaintiff's common-law claims were not barred by this Court's Section 230 precedent, the Court should affirm their dismissal because they do not state a claim under South Carolina law. Although the district court "did not reach" these alternative grounds, "the parties briefed [them] in detail in their district court pleadings" and in their briefs here, so this Court can and should decide them as necessary now in the interest of "expedience and efficiency." *Strickland*, 32 F.4th at 371-72 & n.18.

## A. Meta Did Not Cause Plaintiff's Injuries.

Plaintiff's common-law claims all fail because the complaint does not adequately allege that any action *by Meta* was a factual or legal cause of Roof's murders and, thereby, Plaintiff's injuries. Far from suggesting that anything Meta allegedly did was the cause of Roof's actions, the complaint instead alleges that Roof first discovered white supremacist thinking through other websites found via a Google search. JA061 (¶ 166). And the only non-conclusory allegation that even discusses Roof's use of Facebook is that Roof changed his profile picture a few weeks before he committed murder. JA010 (¶ 13). That is manifestly insufficient to allege causation.

### 1. Meta Was Not the Factual Cause of Roof's Murders.

For her common-law claims, Plaintiff must plausibly allege that Meta was the factual cause of her father's tragic death and thereby her injuries. *See Bray v. Marathon Corp.*, 588 S.E.2d 93, 95 (S.C. 2003) (products liability); *Jolly v. Gen. Elec. Co.*, 869 S.E.2d 819, 828 (S.C. Ct. App. 2021) (negligent product design); *Kinard v. Augusta Sash & Door Co.*, 336 S.E.2d 465, 467 (S.C. 1985) (negligent infliction of emotional distress). In other words, Plaintiff must plausibly allege that "the injury

would not have occurred 'but for'" Meta's alleged conduct. *Oliver v. S.C. Dep't of Highways & Pub. Transp.*, 422 S.E.2d 128, 130 (S.C. 1992) (citation omitted).

Plaintiff resists this standard, contending (at 53-54) that she need only allege that Facebook was a concurring cause of her injuries. But even in cases of concurring cause, a plaintiff still must adequately plead that "the injury would not have resulted to as great an extent" without the defendant's actions, *S.C. Ins. Co. v. James C. Greene & Co.*, 348 S.E.2d 617, 620 (S.C. Ct. App. 1986), *and* that those actions were a "substantial factor," *i.e.*, more than a "mere possibility," "in bringing about the result," *Little v. Brown & Williamson Tobacco Corp.*, 243 F. Supp. 2d 480, 498 (D.S.C. 2001). Plaintiff's complaint falls short.

As the complaint itself recognizes, Roof said in his manifesto that, after he ran a Google search and read "pages upon pages" of material on the Council of Conservative Citizens' website, he "realized that something was very wrong" and has "never been the same since that day." Suppl. JA at 277, *United States v. Roof*, No. 17-3 (4th Cir. Nov. 16, 2020); *see* JA061-062 (¶¶ 166-167). That allegation contradicts any inference that *Facebook* was a factual cause. Indeed, the complaint does not

mention a *single* post that Roof saw or *any* group that he joined on Facebook.

On appeal, Plaintiff does not even attempt to point to well-pleaded allegations raising a plausible inference of factual causation. Instead, she simply says (at 54): "It must be *inferred* from M.P.'s well pled allegations that Facebook plausibly be determined a substantial contributing factor to Roof's process of online radicalization leading to offline violence." (Emphasis added). But she does not cite any allegations in the complaint supporting such an inference because there are none.

### 2. Meta Was Not the Proximate Cause of Roof's Murders.

Even if the complaint had adequately alleged factual causation (it has not), none of Meta's alleged acts was a proximate cause of Roof's murders, as South Carolina law requires. *See Bray*, 588 S.E.2d at 95 (products liability); *Bishop v. S.C. Dep't of Mental Health*, 502 S.E.2d 78, 83 (S.C. 1998) (negligence). Plaintiff and Meta agree that foreseeability is the "touchstone" of this analysis and is measured by the normal response to, or the "natural and probable consequence of," an action. Op.Br.55. But Plaintiff does not offer a plausible argument—let alone point to supporting allegations—that Roof's exceptionally horrific acts

were a normal, natural, or probable response to his limited Facebook use. *See* JA061-062 (¶ 167).[5]

Plaintiff asserts (at 54) that "Meta was and had been well aware of its algorithms' dangerous propensity to radicalize users online and thereby directly spark offline violence." But that conclusory assertion is based on nothing more than attorney say-so. As support, Plaintiff cites only to the first page of the complaint, Op.Br.54 (citing JA006)—tellingly, the only complaint citation in the opening brief's *entire* causation discussion.

As it turns out, the complaint's own allegations render foreseeability implausible. The complaint itself alleges that "online radicalization is expected when individuals engage with extremist content for extended periods of time." JA021-022 (¶ 48). It is hardly foreseeable therefore that someone who "did not spend that much time on Facebook" would become a murderous white supremacist as a result

---

[5] Plaintiff contends (at 57-58) that proximate cause is typically a jury question. But courts in South Carolina have not hesitated to dismiss claims when a plaintiff fails to allege foreseeable harm. *See, e.g.*, *Bishop*, 502 S.E.2d at 83-84; *Hensley v. Heavrin*, 282 S.E.2d 854, 855 (S.C. 1981) (per curiam); *Hubbard v. Taylor*, 529 S.E.2d 549, 553-54 (S.C. Ct. App. 2000); *Crolley v. Hutchins*, 387 S.E.2d 716, 717-18 (S.C. Ct. App. 1989).

of Facebook browsing. JA061-062 (¶ 167). And the complaint alleges that Roof was an aberrant actor who took extreme, violent action precisely *because* he thought that "no one was really doing anything but talking"—further undermining any inference that Meta could have foreseen that he would commit mass murder. JA024-025 (¶ 60). Moreover, the complaint alleges that Meta only "realized in 2016"—*after* the events at issue—"that its algorithms were responsible for the growth of extremism," contradicting any suggestion of foreseeability. JA058 (¶ 157).

Plaintiff insists (at 54) that a defendant need not have foreseen "the particular harm or type of harm that occurred." But Plaintiff ultimately (and correctly) acknowledges that, under South Carolina law, a defendant must be expected to foresee the *type* of harm—"some accident *of this kind.*" Op.Br.56 (emphasis added) (quoting *Oliver*, 422 S.E.2d at 131). Nothing in the complaint plausibly alleges that Meta could have foreseen that Roof would carry out a violent attack, let alone a mass shooting. Instead, Roof's own "willful, malicious, and criminal act[s]" were a superseding cause breaking any potential link to Meta. *Stone v. Bethea*, 161 S.E.2d 171, 173-74 (S.C. 1968).

Other courts have held that plaintiffs failed to plead proximate cause plausibly based on allegations analogous to—and more robust than—those in this case. In *Crosby v. Twitter, Inc.*, for example, the Sixth Circuit rejected the theory that social media companies proximately caused the Pulse nightclub shooting even though the shooter "viewed online content from ISIS" using the companies' services and "became 'self-radicalized.'" 921 F.3d 617, 624-25, 627 (6th Cir. 2019). The court explained that social media companies "do not proximately cause" all potential "ripples of harm" ultimately traceable to them, because those ripples could "flow far beyond [the companies' alleged] misconduct." *Id.* at 625 (citation omitted); *see James v. Meow Media, Inc.*, 90 F. Supp. 2d 798, 808 (W.D. Ky. 2000) (rejecting claims seeking to hold video-game companies producing violent content liable for their users' violent acts). As in those cases, Roof's highly "extraordinary" conduct went well beyond any "normal response to dissemination" of content through a communications service. *Sanders v. Acclaim Ent., Inc.*, 188 F. Supp. 2d 1264, 1276 (D. Colo. 2002).

Apparently recognizing the complaint's inadequacies, Plaintiff asserts (at 53) that she is "due" discovery to show "*how* the evidence ...

will connect the dots in the radicalization of Roof." But "fishing expedition[s]" absent a plausible claim are not permitted. *R. Ernest Cohn, D.C., D.A.B.C.O. v. Bond*, 953 F.2d 154, 159 (4th Cir. 1991). The Federal Rules "'do not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.'" *Desper v. Clarke*, 1 F.4th 236, 249 (4th Cir. 2021) (citation omitted).

Because Plaintiff fails to allege causation plausibly, the Court should affirm the district court's dismissal of the complaint.

## B.  Facebook Is Not a "Product."

The premise of each of Plaintiff's state-law claims is that Facebook is a "product" that, "as designed," was "unreasonably dangerous to the user." JA064-066 (¶ 179 (Count I); ¶ 188 (Count II); ¶ 195 (Count III)). But because Facebook is an *intangible communications service*—and not a "product"—under South Carolina law, each claim fails.

*No* South Carolina court has ever applied a products-liability theory to a communications service like Facebook. And because well-settled law precludes federal courts sitting in diversity from extending "state law as it presently exists," *Washington v. Union Carbide Corp.*, 870 F.2d 957, 962 (4th Cir. 1989), this Court should not "extend [South Carolina] tort

law farther than any [South Carolina] court has been willing to go," *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 348 (4th Cir. 1998).

**1.** As a matter of law, "it is firmly established" that there can be no strict-products-liability claim (Count I) with respect to "services," as opposed to "products." *Fields v. J. Haynes Waters Builders, Inc.*, 658 S.E.2d 80, 90-91 (S.C. 2008). And negligent design (Counts II & III) also requires identification of a product; it differs from strict liability only in requiring the plaintiff to "bea[r] the additional burden of demonstrating the defendant … failed to exercise due care in some respect." *Bragg v. Hi-Ranger, Inc.*, 462 S.E.2d 321, 326 (S.C. Ct. App. 1995); *see also Marshall v. Lowe's Home Ctrs., LLC*, 2016 WL 4208090, at *25 (D.S.C. Aug. 10, 2016) (negligent design requires both the "elements of a strict products liability claim … *and* the additional element" of failure to exercise reasonable care).

"In determining whether" a defendant is offering "services or products," the South Carolina Supreme Court "has focused on [1] the character of the underlying transaction, [2] the law regarding similar transactions in other jurisdictions, and [3] the policy arguments in favor

of imposing strict liability in a given situation." *Fields*, 658 S.E.2d at 91. Each of these factors confirms that Facebook is a service, not a product.

*First*, as to the underlying transaction's character, the complaint alleges that Facebook "deliver[s] content to users and recommend[s] that users make new connections or join new groups." JA030 (¶ 79). And the gravamen of the complaint is that Plaintiff was injured by a Facebook user—Roof—allegedly radicalized *by ideas* he saw online (not even on Facebook). Thus, the complaint itself alleges that Facebook was used as a communications service, not that it is a physical, tangible object.

For that reason, treating Facebook as a product would be manifestly inconsistent with South Carolina law, which has codified "§ 402A of the Restatement of Torts Second." *Laurens Elec. Coop., Inc. v. Altec Indus., Inc.*, 889 F.2d 1323, 1324 (4th Cir. 1989). "In describing the scope of products liability law, the Restatement (Second) of Torts lists examples of items that are covered," *all* of which are "tangible items, such as tires, automobiles, and insecticides." *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034 (9th Cir. 1991).

When an alleged injury stems from published ideas, by contrast, the medium containing the information—whether a book, magazine, or

social media app—is not a product. *See Winter*, 938 F.2d at 1036 ("[W]e decline to expand products liability law to embrace the ideas and expression in a book."); Restatement (Third) of Torts: Prods. Liab. § 19 cmt. d (1998) (where "the plaintiff's grievance … is with the information, not with the tangible medium," courts "have, appropriately, refused to impose strict products liability"). In short, "[t]here is no strict liability for books, movies, or other forms of media." *Est. of B.H. v. Netflix, Inc.*, 2022 WL 551701, at *3 (N.D. Cal. Jan. 12, 2022).

True, the complaint asserts that Facebook is a "product." JA050, JA058-059 (¶¶ 132, 154, 158-159). But this Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The allegation that "[t]he design of Facebook's algorithms" is defective fares no better. JA063 (¶ 173). Facebook's algorithms are not physical "products capable of inflicting grievous bodily injury when the product is defective or misused," nor are they used to operate a physical product. *Laurens Elec. Coop.*, 889 F.2d at 1324. At bottom, Facebook is not comparable to "a product, such as a lawn-mower"; its "essence" is a "service." *In re Breast Implant Prod. Liab. Litig.*, 503 S.E.2d 445, 448-49 (S.C. 1998).

*Second*, courts in other jurisdictions also have consistently held that "[a] product is a *physical article* which results from a manufacturing process and is ultimately delivered to a consumer." *Pierson v. Sharp Mem'l Hosp., Inc.*, 264 Cal. Rptr. 673, 676 (Cal. Ct. App. 1989) (emphasis added); *see also* Restatement (Third) of Torts: Prod. Liab. § 19(a) (a "product" subject to strict liability is "*tangible* personal property distributed commercially for use or consumption" (emphasis added)).

As one court recently explained, "[p]roduct liability doctrine is inappropriate for analyzing" social media services because they "are not tangible products," "the necessary functionality of the product is not easily defined" for applying the concept of design defect, and "the interaction between [social media services] and their customers is better conceptualized as a course of conduct implemented … through computer algorithms." *Social Media Cases*, 2023 WL 6847378, at *15 (Cal. Super. Ct. Oct. 13, 2023).

For these reasons, courts across the country have rejected efforts to apply products-liability theories to websites or apps—including Facebook—that facilitate communication and connections between users. *See Jacobs v. Meta Platforms, Inc.*, 2023 WL 2655586, at *4 (Cal. Super.

Ct. Mar. 10, 2023) ("Facebook is more akin to a service than a product.");
*see also*, *e.g.*, *James v. Meow Media, Inc.*, 300 F.3d 683, 687, 700-01 (6th Cir. 2002) ("video games, movies, and internet sites" are not "products"); *In re Facebook, Inc.*, 625 S.W.3d 80, 85 n.1 (Tex. 2021) (noting trial court dismissal of "products-liability claim on the ground that Facebook is not a 'product'"); *Ziencik v. Snap, Inc.*, 2023 WL 2638314, at *4 (C.D. Cal. Feb. 3, 2023) (Snapchat is not a "product" for purposes of strict-liability claims); *Intellect Art Multimedia, Inc. v. Milewski*, 2009 WL 2915273, at *7 (N.Y. Sup. Ct. Sept. 11, 2009) (a "website [that] is a forum for third-party expression" is a "'service'").  *But see Social Media Adolescent Addiction*, 2023 WL 7524912.

*Finally*, the policy considerations that animate products liability confirm that Facebook is not a product.  Because "[a] product is a physical article which results from a manufacturing process," "[a] defect in the article … is ultimately objectively measurable."  *Pierson*, 264 Cal. Rptr. at 676.  But even for tangible products, "the concept of 'design defect'" is "concededly one of the most difficult areas for precise definition." *Anderson v. Owens-Corning Fiberglas Corp.*, 53 Cal. 3d 987, 995 (1991).

This framework is entirely unworkable as applied to services and intangible goods generally, let alone a communications service. *See Breast Implant Prod.*, 503 S.E.2d at 448-49 (sale of products involves "qualitatively different" considerations than provision of services based on "knowledge and skill"). There is no objectively measurable basis for determining that Facebook was defectively designed—meaning, as alleged, that "[t]he dangers inherent in the design of Faceboo[k] ... outweigh [its] benefits." JA064 (¶ 178).

Meta's apps are "not static things; they are programs that facilitate an interactive experience." *Social Media Cases*, 2023 WL 6847378, at *20. "Without the foundational element of a static product from which ordinary consumer expectations or benefits from use of the product can be discerned, there is no reasonable basis for applying the tests for whether a product is defective." *Id.*

The complaint seeks to hold Meta strictly liable for developing a social media service used by billions of people on which some users communicated, among other things, "hate speech and misinformation." JA063 (¶ 174). Just as telephone companies are not liable if callers spread "defamatory messages" on their wires, *Anderson v. N.Y. Tel. Co.*,

320 N.E.2d 647, 649 (N.Y. 1974) (Gabrielli, J., concurring), a communications service does not become inherently defective if users spread "extreme and outrageous hate speech, misinformation, and conspiracy theories," JA063 (¶ 172). Any attempt to devise "objectively measurable" standards for intangible "defect[s]" in communications platforms, *Pierson*, 264 Cal. Rptr. at 676, "could seriously inhibit those who wish to share thoughts and theories," *Winter*, 938 F.2d at 1035; *see also Way v. Boy Scouts of Am.*, 856 S.W.2d 230, 239 (Tex. App. 1993) ("ideas and information contained in the magazine [that] encouraged children to engage in activities that were dangerous" were "intangible characteristics, not tangible properties").

It makes little sense to extend products liability beyond "tangible items" to "ideas and expression." *Winter*, 938 F.2d at 1034, 1036. "The purposes served by products liability law … are focused on the tangible world and do not take into consideration the unique characteristics of ideas and expression." *Id.* at 1034.

**2.** Plaintiff tries to undercut the product-service distinction in her opening brief, but her preemptive arguments lack merit.

*First*, Plaintiff cannot dispute the fundamental premise that a products-liability claim cannot lie with respect to "services," as opposed to "products." *Fields*, 658 S.E.2d at 90-91. Instead, Plaintiff attempts (at 44) to distinguish binding South Carolina precedent by arguing that it is focused on "*the provider* and that provider's role," not whether "*the thing* itself" is a product or service. That misses the point. Cases like *Breast Implant Product* simply illustrate that even when there *is* a physical product, providing a service *related* to that product does not thereby turn the service into a product. *See* 503 S.E.2d at 448-49. If services provided in connection with the purchase of a physical product are not a "product," neither is the provision of communications services.

Plaintiff cites (at 46) *Priest v. Brown*, 396 S.E.2d 638 (S.C. Ct. App. 1990), for the proposition that intangibles like "electricity" can be products. But *Priest* concerned the "faulty mechanical design" "of the distribution line" through which electricity flowed—not, as Plaintiff misleadingly claims, the electricity itself. *Id.* at 640, 642. In any event, electricity—intangible or not—can cause physical harm to those who touch it. Facebook cannot.

*Second*, Plaintiff's pivot (at 47) to "extra-circuit cases" fares no better. She starts (at 47) with California law, but courts applying California law have repeatedly held that websites and online services are *not* "products" subject to products-liability law. *See, e.g.*, *Social Media Cases*, 2023 WL 6847378, at *19; *Ziencik*, 2023 WL 2638314, at *4 (Snapchat not a product); *Jackson v. Airbnb, Inc.*, 639 F. Supp. 3d 994, 1010-11 (C.D. Cal. 2022) (Airbnb not a product). And a California court has held that "*Facebook* is more akin to a service than a product." *Jacobs*, 2023 WL 2655586, at *4 (emphasis added).

Plaintiff's supposedly contrary cases do not even decide this issue. For example, in *Lemmon*, 995 F.3d 1085, the "Ninth Circuit did not address whether Snapchat … was 'a product' for purposes of California tort law." *Jacobs*, 2023 WL 2655586, at *3-4. In *Hardin v. PDX, Inc.*, 227 Cal. App. 4th 159 (2014), the defendant did not *argue* that a "software program" is not a "product." *Id.* at 170 (emphasis omitted). And in *Simulados Software, Ltd. v. Photon Infotech Private, Ltd.*, 40 F. Supp. 3d 1191, 1199 (N.D. Cal. 2014), the court held that software is a "good" for purposes of the Uniform Commercial Code, without addressing tort law.

Plaintiff cites (at 48) dicta from *Winter* suggesting that "[c]omputer

software that" "depict[s] … technical, mechanical data" and is "used to guide an individual … *may be*" a product, just as a "compass" that leads a user astray is a "physical 'product.'" 938 F.2d at 1036 (emphasis added). But *Winter* makes clear that wherever they appear, "ideas and expression" are not products, and neither is "[a] publisher's role in bringing ideas and information to the public." *Id.* at 1036, 1037 n.8.

That leaves *Social Media Adolescent Addiction* as Plaintiff's only California case. But that case lends Plaintiff no support because it did not address purported defects in the algorithmic promotion of content—the focus of the complaint here. The court there held that "plaintiffs have *not* established as a global matter that defendants' [social media] platforms are akin to tangible personal property such that they are products." 2023 WL 7524912, at *26 (emphasis added). Rejecting an all-or-nothing approach, the court instead analyzed "the various functionalities of defendants' platforms" to determine whether the plaintiff's claims against specific platform functionalities "focused primarily on content" (which are not cognizable) or "primarily on design" (which are). *Id.* at *27, *29 (emphasis omitted).

The court had no occasion, however, to apply its idiosyncratic

approach to the claims premised on "defendants' recommendation algorithms" because the claims were "barred by Section 230 and no longer part of th[e] case." 2023 WL 7524912, at *26. And the court cast no doubt on the holdings of other courts that had treated such claims "relating to content-delivery systems" as "not cognizable." *Id.* (expressing no disagreement with *Rodgers v. Christie*, 795 F. App'x 878, 880 (3d Cir. 2020), which held that "an 'algorithm' or 'formula'" is not a product). Ultimately, as the California Superior Court explained in the *Social Media Cases*, products-liability theories are ill-suited for "computer algorithms," which are not "static" products but instead "implemen[t]" a "course of conduct." 2023 WL 6847378, at *15, *20.

Plaintiff's reliance (at 49 & n.11) on Texas, Oregon, and Louisiana cases is similarly misplaced. In *Hou-Tex, Inc. v. Landmark Graphics*, the court affirmed an award of summary judgment *to the defendant* on all products-liability claims. 26 S.W.3d 103, 105, 107 n.2 (Tex. App. 2000) (assuming in dicta "for purposes of th[e] appeal" that software at issue might be a product but "not imply[ing] that all software programs are products for purposes of products liability"). In *Omegle.com,* 614 F. Supp. 3d at 814, no party raised the argument that social media apps are not

products, *see A.M. v. Omegle.com LLC*, 2023 WL 1470269, at *1-2 (D. Or. Feb. 2, 2023), so the court could not have "held" as much, *contra* Op.Br.49. And in *Schafer v. State Farm Fire & Casualty Co.*, 507 F. Supp. 2d 587 (E.D. La. 2007), the court observed in dicta that a computer program used for estimating insurance losses "*may be* a product for the purposes" of Louisiana's products-liability law, *id.* at 601 (emphasis added), but relied on a Louisiana case concluding that "[p]hysical recordings of computer software" are a form of "personal property" for purposes of New Orleans' tax code, *S. Cent. Bell Tel. Co. v. Barthelemy*, 94-0499 (La. 10/17/94), 643 So. 2d 1240, 1244. None of these cases says anything about whether Facebook qualifies as a "product" under South Carolina's products-liability law.

*Finally*, Plaintiff resorts to meritless policy arguments, citing an article by an attorney who has sued Meta and several other companies seeking to expand products-liability law in States across the country. Op.Br.45 n.8, 52-53 (citing Matthew P. Bergman, *Assaulting the Citadel of Section 230 Immunity: Products Liability, Social Media, and the Youth Mental Health Crisis*, 26 Lewis & Clark L. Rev. 1159 (2023)); *see*

Bergman, *supra*, at 1159 n.*.  But those arguments do not justify extending South Carolina law.

Plaintiff, for instance, asserts (at 52) that Facebook should bear the costs of its service because Facebook is better "positioned" to know the risks.  That is often true when a service is provided:  A health care provider offering breast implants knows more about the risks than a patient, but the South Carolina Supreme Court nonetheless has rejected products liability for that service.  *Breast Implant Prod.*, 503 S.E.2d at 448-49.  The Court should do the same here.[6]

## C.    The Complaint Does Not Allege that Plaintiff Was a "User or Consumer" of Facebook.

Finally, none of Plaintiff's state-law claims is cognizable under South Carolina law because she is not alleged to have used Facebook.  South Carolina's strict-products-liability statute provides that sellers of defective products are "subject to liability for physical harm caused *to the ultimate user or consumer*."  S.C. Code Ann. § 15–73–10(1) (emphasis

---

[6] Plaintiff also notes (at 42-43) that Meta has sometimes called Facebook a "product."  But "the use by Facebook of the term 'product'" in other contexts "does not resolve the question of whether Facebook represents a 'product' for the purposes of this analysis."  *Jacobs*, 2023 WL 2655586, at *3 n.1.

added).  This basic requirement reflects the legislature's decision to extend no-fault liability only to the "primary and direct victim of the product defect." *Bray*, 588 S.E.2d at 95.

Thus, only the "ultimate user who is injured by" the product can bring a claim for strict products liability. *Brooks v. Medtronic, Inc.*, 750 F.2d 1227, 1230 (4th Cir. 1984).  "[B]ystanders, and others who may come in contact with the product … have been denied recovery" on strict-liability theories. *Lawing v. Univar, USA, Inc.*, 781 S.E.2d 548, 555 (S.C. 2015) (quoting Restatement (Second) of Torts § 402A cmt. o).  And because Plaintiff frames *all* of her state-law claims as products-design theories, she must satisfy the user-or-consumer element for each claim. *See Marshall*, 2016 WL 4208090, at *25 (explaining that a negligent-products-design claim includes all the elements of a strict-liability products-design claim and an "additional element"); *Bragg*, 462 S.E.2d at 326 ("[U]nder *any* products liability theory, the plaintiff must show … the injury occurred because the product was in a defective condition, unreasonably dangerous *to the user*" (emphases added)).

Here, Plaintiff does not allege that she ever visited Facebook, much less that she was injured in her capacity as the ultimate user or consumer

of Facebook. At most, she alleges in conclusory fashion that it was "foreseeable" that "online radicalization" of third-party users, such as Roof, could lead to "offline violence" against non-users. JA007, JA011, JA034 (¶¶ 7, 15, 90). But the South Carolina Supreme Court has expressly rejected an "expansive definition" of "user" to embrace "all 'persons who could foreseeably come into contact with the dangerous nature of a product.'" *Lawing*, 781 S.E.2d at 556 (citation omitted). The "user" limitation is narrower than "a limitation on foreseeable victims," *Bray*, 588 S.E.2d at 96, and "a foreseeability analysis … is improper" because it is "far too broad," *Lawing*, 781 S.E.2d at 556.

Plaintiff counters (at 60) that "[u]ser" includes "those in the zone of danger of the final purchaser, such as a family member, employee, guest, [or] donee." But—aside from the fact that Plaintiff is none of those things—the family member, employee, guest, or donee must still *use* the product, even if he does not himself "aquir[e] the product directly from the seller." Restatement (Second) of Torts § 402A, cmt. *l*.

Nothing in *Commissioners of Public Works of City of Charleston v. Costco Wholesale Corp.*, 2021 WL 5908758 (D.S.C. Dec. 13, 2021) (cited at 60), supports Plaintiff's contrary, expansive definition of "user." That

case treated the plaintiff water utility as a "user of Defendants' flushable wipes" only because the plaintiff "*must* handle Defendants' products." *Id.* at *4-5. Plaintiff alleges nothing here resembling the physical contact with physical products that satisfied the "user" requirement there.

Plaintiff also contends (at 11) that Meta owed her a "duty to design" a safe product because she "was a foreseeable victim." Even assuming a general duty could substitute for a finding that Plaintiff was a user or consumer of Facebook, the complaint includes no plausible allegations to support this contention. Meta could hardly have foreseen that Roof—who, according to the complaint, spent little time on Facebook, JA024-025, JA061-062 (¶¶ 60, 167)—would commit his heinous crimes, *see supra* Part II.A.2.

In any event, it is black-letter law that "[f]oreseeability itself does not give rise to a duty." *S.C. State Ports Auth. v. Booz-Allen & Hamilton, Inc.*, 346 S.E.2d 324, 325 (S.C. 1986); *see Oulla v. Velazques*, 831 S.E.2d 450, 458 (S.C. Ct. App. 2019) (same).[7] "It is the relationship between the

---

[7] Plaintiff responds (at 61) by citing *Rife v. Hitachi Construction Machinery Co.*, 609 S.E.2d 565 (S.C. Ct. App. 2005). But that case held only that "foreseeability" is the "touchstone *of proximate cause* in South Carolina." *Id.* at 569 (emphasis added).

parties, not the potential foreseeability of injury, that determines whether the law will recognize a duty in a given context." *In re Blackbaud, Inc., Customer Data Breach Litig.*, 567 F. Supp. 3d 667, 680 (D.S.C. 2021) (citation omitted). And there is no support in South Carolina law for imposing a legal duty on social media companies to prevent harm that is committed by third parties. To the contrary, South Carolina courts have specifically "rejected the idea that one who undertakes a duty to render services to another should recognize a duty to third persons." *Oulla*, 831 S.E.2d at 458. Meta did not assume any duty to third parties, including Plaintiff, just because Roof allegedly used Facebook.

## III.  If Plaintiff Had Pleaded a Section 1986 Claim, It Would Fail.

Plaintiff's complaint alleges that Meta "participated in [a] conspiracy" with the Russian Defendants, in violation of Section 1985(3). JA068 (¶ 207). The district court rightly concluded that Plaintiff failed "to plausibly allege a claim under § 1985(3)." JA095. And Plaintiff forfeited any challenge to the district court's conclusion by failing to raise it in her opening brief. *United States v. Hasson*, 26 F.4th 610, 616 (4th Cir. 2022).

Nonetheless, Plaintiff now insists (at 37) that the district court "ignored" a claim against Meta under Section 1986. Plaintiff is wrong. The district court did not address this claim because the complaint did not cite Section 1986 or otherwise put Meta or the district court on notice of any such claim. *See* JA067-070. But, because a Section 1986 claim would fail in any event, this Court should affirm the district court's decision dismissing any such claim against Meta. *See Ostrzenski v. Seigel*, 177 F.3d 245, 253 (4th Cir. 1999) (the court may affirm on any ground supported by the record).

Section 1986 "provides a cause of action against anyone who has knowledge of a § 1985 conspiracy and who, 'having the power to prevent or aid in preventing the commission of' acts pursuant to that conspiracy, 'neglects or refuses so to do.'" *Strickland*, 32 F.4th at 360 (quoting 42 U.S.C. § 1986). "Section 1986 claims are therefore derivative of § 1985 violations." *Id.* (citation omitted). Here, any § 1986 claim would fail for multiple independent reasons.

**A.** First, Section 230 bars any Section 1986 claim premised on the theory that Meta allegedly did not prevent the Russian Defendants from carrying out a conspiracy on Facebook by failing to remove the Russian

Defendants' content. *See* Op.Br.35-36, 40-41; JA069 (¶ 210). Holding Meta liable for publishing Russian content online is core Section 230 territory. *See supra* Part I.A.

**B.** Second, although the contours of Plaintiff's Section 1985(3) conspiracy theory are not clear, Plaintiff appears to suggest (at 35) that Meta is liable under Section 1986 because it "knew about" and "failed to take any action" to prevent the Russian Defendants from sowing "racially based animus" online. That theory also fails on the merits.

The complaint does not plausibly allege that Meta had the "power" to prevent the Russian Defendants from acting. "Few courts appear to have addressed this element, but those finding the requisite power to be present have done so where the defendant was a government official or employee with some formal authority to act." *Thompson v. Trump*, 590 F. Supp. 3d 46, 107 (D.D.C. 2022), *aff'd sub nom. Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023). And even if Section 1986 extends to "private individual[s]," it applies only to those "with actual authority to compel others to act or refrain from acting." *Smith v. Trump*, 2023 WL 417952, at *7 (D.D.C. Jan. 26, 2023), *aff'd*, 2023 WL 9016458 (D.C. Cir. Dec. 29, 2023) (per curiam).

Meta obviously is not a government official or employee. It just as obviously lacked authority to compel the Russian Defendants to refrain from using "American Social Media companies" generally. JA055 (¶ 145).

And while Meta had authority to prevent the Russian Defendants from using Facebook, the allegations connecting Roof to Facebook are razor thin—and there are no allegations that Roof ever actually saw or interacted with any Russian-posted content on Facebook. *See supra* pp. 10-11. To the contrary, the complaint alleges that the Russian Defendants first bought advertisements on "social media sites" in "early 2015," JA054 (¶ 142)—but that Roof was radicalized when he performed a Google search after Trayvon Martin's death *in 2012*, JA024-025 (¶ 60).

If that were not enough, the complaint does not plausibly allege that Meta had actual *knowledge* that the Russian Defendants were conspiring to use Facebook to deprive others of civil rights in violation of Section 1985(3)—let alone that Meta knew sufficiently in advance of June 17, 2015, to give Meta the ability to prevent the Russian Defendants (and Roof) from acting. *See Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994) (Section 1986 requires "actual knowledge" of an alleged Section 1985 conspiracy).

At most, the complaint alleges that Meta "knew or should have known" about fake accounts, JA056-057 (¶ 149), Russian state operatives, JA052 (¶ 137), third parties promoting racism, JA025 (¶ 63), and a purpose by "Russian and other foreign actors" to interfere in elections, JA068 (¶ 207). But there is no plausible allegation that Meta knew of a *conspiracy* between these Russian Defendants to violate any person's civil rights via Facebook.

And even if the complaint cleared that hurdle, it makes abundantly clear that Meta did know about any potential Russian actors on Facebook, let alone a conspiracy among them to violate Section 1985, until *after* Roof's murders. The complaint alleges that the Russian Defendants did not buy advertisements on "social media sites" until "early 2015," JA054 (¶ 142), and that the Russian Defendants "disguise[d]" their "identities" to carry out "covert" activities on Facebook, JA054-055 (¶¶ 142, 143). Those efforts, according to the complaint, were "highly organized" and "sophisticated," so that the accounts the Russian Defendants created "appeared to be genuine U.S. persons." JA054-056 (¶¶ 141, 146).

The complaint also alleges that Meta first publicly reported Russian expenditures on Facebook (not tied to any particular entity, let alone the Russian Defendants here) more than two years *after* Roof's murders.  JA056-057 (¶ 149).

Plaintiff offers no meaningful analysis of these defects.  She merely asserts (at 35) that Meta "knew about the fake accounts and racially based animus and race war the Russian Defendants were targeting on South Carolina," yet "failed to take any action."  But that conclusory argument has no basis in any well-pleaded allegations.

**C.**  Even if Plaintiff could plead a viable Section 1986 claim against Meta, however, it would have been untimely.  Section 1986 has a one-year statute of limitations:  "[N]o action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued."  42 U.S.C. § 1986.

Here, any Section 1986 claim in the complaint falls outside that one-year window.  Roof's horrific attack took place on June 17, 2015.  JA006 (¶ 1).  Plaintiff concedes that she reasonably should have known about the "covert Russian election interference activities, including" attempts to use social media to "manipulat[e]" people like Roof, which

she (conclusorily) alleges had a causal link to her injuries, in April 2019. JA070-071 (¶ 219); *see* JA071 (¶ 220).

Any Section 1986 claim therefore accrued in April 2019 *at the latest*. *See A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 348 (4th Cir. 2011) ("A civil rights claim accrues when the plaintiff 'knows or has reason to know of the injury which is the basis of the action.'" (citation omitted)). Yet Plaintiff did not file this suit for another three-and-a-half years—on November 2, 2022. Any Section 1986 claim should be dismissed as untimely.

No tolling—minority or equitable—can save a Section 1986 claim here. Section 1986's one-year limitations period contains no exception for minors, *see* 42 U.S.C. § 1986, and one cannot be read into the provision. As this Court has explained, "[t]he blackletter rule … is that a statute of limitations runs against all persons, even those under a disability, unless the statute expressly provides otherwise." *Vogel v. Linde*, 23 F.3d 78, 80 (4th Cir. 1994); *see Booth v. United States*, 914 F.3d 1199, 1205 (9th Cir. 2019) ("minority tolling for federal statutes of limitations" is permitted "only if the statute setting out the limitations period so specifies"). "This rule is regularly applied to federal statutes,"

like Section 1986, "that contain a limitations period but no exception for disability." *Vogel*, 23 F.3d at 80 (citing cases). This Court's "duty," then, is to apply Section 1986 as written. *Id.*

Likewise, equitable tolling does not apply to Section 1986. *See Johns v. Home Depot U.S.A., Inc.*, 221 F.R.D. 400, 407 (S.D.N.Y. 2004); *Bieros v. Nicola*, 839 F. Supp. 332, 337 (E.D. Pa. 1993). But even if it did, Plaintiff has not shown that this is one of those "rare instances" where it would be "unconscionable to enforce the limitation period." *Raplee v. United States*, 842 F.3d 328, 333 (4th Cir. 2016) (citation omitted); *see also Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005) (litigant seeking equitable tolling must show diligence and extraordinary circumstances).

Because the complaint concedes that Plaintiff should have known by April 2019 about the alleged actions of Meta and the Russian Defendants, *see* JA070-071 (¶¶ 219-220), and Plaintiff identifies no extraordinary circumstance that prevented her from filing suit, any Section 1986 claim therefore fails because it is untimely.

## CONCLUSION

The Court should affirm the district court's order dismissing all of Plaintiff's claims against Meta.

## STATEMENT REGARDING ORAL ARGUMENT

Meta does not believe oral argument is necessary to resolve this appeal.  But, to the extent the Court would find argument useful, Meta would be pleased to participate.

Respectfully Submitted,

March 18, 2024

/s/ *Helgi C. Walker*
Helgi C. Walker
Jacob T. Spencer
Jessica L. Wagner
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500
hwalker@gibsondunn.com

*Counsel for Appellees Meta*
*Platforms, Inc., f/k/a Facebook, Inc.;*
*Facebook Payments, Inc.; Facebook*
*Technologies, LLC; Instagram, LLC;*
*Siculus, Inc.; and Facebook*
*Holdings, LLC*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this brief complies with the applicable typeface, type style, and type-volume limitations. This brief was prepared using a proportionally spaced type (New Century Schoolbook, 14 point font). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 12,965 words. This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief.

March 18, 2024

*/s/ Helgi C. Walker*
Helgi C. Walker
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306

# STATUTORY ADDENDUM

# TABLE OF CONTENTS

**Page**

47 U.S.C. § 230 ...................................................................Add. 1

42 U.S.C. § 1985 ...............................................................Add. 6

42 U.S.C. § 1986 ...............................................................Add. 8

## 47 U.S.C. § 230 - Protection for private blocking and screening of offensive material

**(a)  Findings**

The Congress finds the following:

**(1)** The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

**(2)** These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

**(3)** The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

**(4)** The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

**(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

**(b)  Policy**

It is the policy of the United States—

**(1)** to promote the continued development of the Internet and other interactive computer services and other interactive media;

**(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

**(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

**(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**(c)    Protection for "Good Samaritan" blocking and screening of offensive material**

**(1) Treatment of publisher or speaker**
No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

**(2) Civil liability**
No provider or user of an interactive computer service shall be held liable on account of—

**(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

**(B)** any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

**(d)    Obligations of interactive computer service**

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

**(e)    Effect on other laws**

**(1) No effect on criminal law**
Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, or any other Federal criminal statute.

**(2) No effect on intellectual property law**
Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

**(3) State law**
Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

**(4) No effect on communications privacy law**
Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

**(5) No effect on sex trafficking law**
Nothing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit—

**(A)** any claim in a civil action brought under section 1595 of title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title;

**(B)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of title 18; or

**(C)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 2421A of title 18, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

**(f)    Definitions**

As used in this section:

**(1) Internet**
The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

**(2) Interactive computer service**
The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

**(3) Information content provider**
The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

**(4) Access software provider**

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

    **(A)** filter, screen, allow, or disallow content;

    **(B)** pick, choose, analyze, or digest content; or

    **(C)** transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

# 42 U.S.C. § 1985 - Conspiracy to interfere with civil rights

**(1)    Preventing officer from performing duties**
If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties;

**(2)    Obstructing justice; intimidating party, witness, or juror**
If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

**(3)    Depriving persons of rights or privileges**
If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing

to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

## 42 U.S.C. § 1986 - Action for neglect to prevent

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2024, I caused a copy of the foregoing brief, together with the addendum, to be served via ECF, on all counsel of record.

/s/ *Helgi C. Walker*
Helgi C. Walker
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306